## Exhibits

Exhibit "A" – Copy of Letter from Pierce & Associates, L.L.C. with Dorothy's original statement.

Exhibit "B" – Copy of Letter from Pierce & Associates, L.L.C. with Roderick Earl Johnson's original statement.

Dorothy Jo Mallard's Trial Testimony

Roderick Earl Johnson's Trial Testimony

Audrey Martin's Trial Testimony

Dr. Roger Casama's Trial Testimony

Page 16 from hearing where Bond was discussed


Exhaustion

Application for Post Conviction Relief & Denial

Supervisory Writ & Denial

Supervisory Writ of Review & Denial

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

---

No. 11-31023

---

IN RE: PATRICK MCCLENDON,

Movant

---

Motion for an order authorizing
the United States District Court for the Eastern
District of Louisiana to consider
a successive 28 U.S.C. § 2254 application

---

Before BENAVIDES, STEWART, and CLEMENT, Circuit Judges.

PER CURIAM:

Patrick McClendon, Louisiana prisoner # 106727, seeks authorization from this court to file a successive 28 U.S.C. § 2254 application to challenge his conviction and life sentence for second degree murder. McClendon asserts that he should be allowed to file a new § 2254 application challenging, under *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527 (2009), the admission of the coroner's testimony as a violation of his right to confrontation. He also seeks to raise a new claim, namely that the prosecutor engaged in misconduct and that he therefore was denied his rights to due process and a fair trial. In support, McClendon attempts to rely on newly discovered evidence: the existence of a deal of leniency or immunity with two State witnesses in exchange for their testimony at trial, and the original recorded statement of one of those witnesses.

A second or successive § 2254 application must be certified by this court to contain either newly discovered evidence or "a new rule of constitutional law,

**Exhibit A-1**

No. 11-31023

made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C. § 2244(b)(2)(A), (B). If the movant alleges newly discovered evidence, he must show that "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence," and that such facts "if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." § 2244(b)(2)(B).

This court may authorize the filing of a successive habeas corpus application only if the movant has made a prima facie showing that the motion satisfies the applicable requirements. § 2244(b)(3)(C). A prima facie showing is a showing of possible merit sufficient to warrant a fuller exploration by the district court. *In re Hearn*, 418 F.3d 444, 445 (5th Cir. 2005).

We conclude that McClendon has made a prima facie showing sufficient to warrant a fuller exploration by the district court. *See id.* However, we note that the district court shall dismiss any claims that do not satisfy the successive standard. *See* § 2244(b)(4).

Accordingly, IT IS ORDERED that McClendon's motion for authorization to file a successive § 2254 application is GRANTED.

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

PATRICK MCCLENDON                          CIVIL ACTION

VERSUS                                     NUMBER: 12-0307

N. BURL CAIN, WARDEN                       SECTION: "N"(5)

### REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(A), presently before the Court is the application for federal habeas corpus relief of petitioner, Patrick McClendon, the State's response, and McClendon's reply. (Rec. docs. 3, 12, 13). Having determined that an evidentiary hearing is not necessary, it is recommended, for the reasons that follow, that McClendon's petition be dismissed as successive.

I.   PROCEDURAL HISTORY

Petitioner McClendon is a state prisoner who is currently incarcerated at the Louisiana State Penitentiary, Angola, Louisiana. On April 6, 1995, McClendon and co-defendant Nevils Watts were found guilty of second degree murder after trial, by jury, in the Twenty-Second Judicial District Court for the Parish of Washington, State of Louisiana. On April 24, 1995, McClendon

**Exhibit B**

was sentenced to life in prison at hard labor without benefit of parole, probation, or suspension.  On April 16, 2003, McClendon filed with this Court an application for federal habeas corpus relief which was denied as untimely. McClendon v. Cain, No. 2003-1119 (E.D. La. 7/28/04).[1]

On March 22, 2010, McClendon filed a second post-conviction application with the state district court, explaining that his application was not time-barred because his new claims were "based upon a new ruling of law and new discovered evidence."[2]  The "new law" cited by McClendon was Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009).  The "new information" was described by McClendon as information attained "from Pierce & Associates concerning [the] State's key witness Dorothy Jo Mallard, and the initial [t]aped Statement from Roderick Johnson," another state witness.[3]  On May 17, 2010, the state district court, acknowledging and implicitly accepting McClendon's assertion that his claims were not time-barred, denied relief on the merits, providing: "The Court has reviewed the petition and the record of this matter, and finds that petitioner has failed to prove grounds which would entitle him to

---

[1]A detailed recitation of the state court proceedings which preceded McClendon's first habeas petition are set forth in this Court's report and recommendation. McClendon, No. 2003-1119 (E.D. La. 01/12/04).

[2]St. Rec. Vol. 7 of 8, Memorandum in Support of Application for Post Conviction Relief, p. 2.

[3]Id.

2

# Pierce & Associates, L.L.C.

- Civil & Criminal Investigations -
Baton Rouge - New Orleans
P.O. Box 14478
Baton Rouge, LA 70898

Jackson A. Pierce
Email - jackpierce1@cox.net

Telephone 225-642-4030
Facsimile 225-642-4009

March 25, 2009

Patrick McClendon
Bear 2 Camp – C
Louisiana State Prison
Angola, Louisiana  70712

Dear Patrick: ·

I am in receipt of your recent letter I received on February 25, 2009.
Please be advised that I have followed up with the Washington Parish
authorities regarding the date that the charges were dropped against
Dorothy Mallard.  Because of the broad powers of the district attorney
they do not need to formally dismiss or drop any charges when a person
has not been indicted or a bill of information has not been filed against
them. In other words, they just chose to do nothing. The fact that she
was arrested has no consequence with the district attorney's office. She
simply was just not prosecuted and we know why.

Regarding the extradition document investigation I am now focusing my
efforts to determine if Columbia has any records. You had told me that
you were in jail near McComb so I had assumed that's where the
extradition had to have taken place. I will keep you informed.

Very truly yours,

Jack Pierce

JP/cp

1   MR. ADAMS:

2          Yes, I do, Your Honor.  Apparently as part

3   of our cross-examination of Ms. Mallard and our

4   ability to impeach her and to show that she's

5   received a certain sentence for her testimony,

6   it's come to my knowledge that she was released

7   some four days, three days after she was arrested

8   on a fifty thousand dollar bond which apparently

9   was set by this Court, and I find myself in a

10  position of having to question Mr. Edwards here

11  and possibly the Court as to what reason --

12  THE COURT:

13         You can't question me.

14  MR. ADAMS:

15         -- as to what reasons were given for

16  securing a fifty thousand dollar bond in a

17  capital case when none is provided by law.  So I

18  am going to have to ask this gentleman what he

19  told you to request that bond and I am going to

20  have to ask you what he told you.

21  THE COURT:

22         No.  You understand you cannot ask a

23  presiding judge questions.

24  MR. ADAMS:

25         Then I have to move for mistrial, Your

26  Honor.

27  THE COURT:

28         That's your problem.  It's denied.

29  MR. ADAMS:

30         Can we perhaps have someone else hear this

31  to make a determination?

32  THE COURT:

# Pierce & Associates, L.L.C.

- Civil & Criminal Investigations -
Baton Rouge - New Orleans
P.O. Box 14478
Baton Rouge, LA 70898

Jackson A. Pierce
Email - jackpierce1@cox.net

Telephone 225-642-4030
Facsimile 225-642-4009

January 15, 2009

Patrick McClendon
Louisiana State Penitentiary
Angola, Louisiana

Re: Patrick McClendon

Dear Mr. McClendon:

Please find enclosed my report and numerous documents in regards to your case.

Should you have any questions please call.

Very truly yours,

Jack Pierce

JP/cp
Enclosures

# Exhibit "B"

1   Q.   Do you know where she was that afternoon?

2   A.   She was crossing the street.

3   Q.   Do you know where she was at?  Was she down the street

4   or --

5   A.   I don't know.  All I know her and her little boy were

6   walking, you know, live right across, going across the

7   street.

8   Q.   They were going down the street?

9   A.   Okay.

10  Q.   If you can, from the time that your attention was

11  called to this incident here, can you recall what happened?

12  A.   Well, I tell you, I just had came in from making

13  groceries and I was at the gate, and when they pulled up,

14  Michael Ray tried to get out.  He got out of the car.

15  Q.   That's when --

16  A.   And she got out too.  That's how I got to see her.

17  Q.   Is that when you heard two shots?

18  A.   Right.

19  Q.   Is there any doubt in your mind about this?

20  A.   No.  Mister, I'm telling you the truth, the God

21  heavens truth.

22  Q.   And the last month or two months or three months, has

23  any officer or did an officer by the name of Randy Hodges,

24  did he come out to talk to you about this case?

25  A.   I don't know.  I don't know no Randy Hodges.  I know

26  Mr. Mike Edwards came out there.

27  Q.   Mr. Mike Edwards?

28  A.   Yes, he did.

29  Q.   Did he take the opportunity to talk to you?

30  A.   Yes, he did.

31  Q.   Your next door neighbor hasn't been home lately, has

32  she?

ROBERT MARTIN

1  tell us what your occupation is, please.

2  A.  Just a housewife.

3  Q.  You're a housewife?

4  A.  Yes.

5  Q.  And you have lived in Bogalusa all your life?

6  A.  I have been here twenty-four years or twenty-five.

7  Q.  Do you have a family, ma'am?

8  A.  Yes, I do.

9  Q.  How many children do you have?

10 A.  I got three girls and three boys.  Six.

11 Q.  And you have raised those children here in Bogalusa?

12 A.  No.  I just raised two of them here.  They grown.  The

13 rest of them grown.

14 Q.  Do you know anyone in this case?  Do you have any --

15 is anyone related to you?  Do you have any --

16 A.  No.

17 Q.  Do you know me?

18 A.  No.

19 Q.  Do you know any of these people here that are at the

20 table?

21 A.  No.

22 Q.  On the day that you saw Ms. Mallard shoot this boy,

23 did you see anyone else shoot anyone?

24 A.  No, I didn't.

25 Q.  Did you see Nevils Watts there that day?

26 A.  I ain't never seens that man in my life.

27     MR. ADAMS:

28          Thank you very much, ma'am.  Appreciate you

29       coming down.

30     THE WITNESS:

31          Thank you.

32     REDIRECT EXAMINATION BY MR. BURRIS:

1    Q.    You saw the lady that you just looked at, you saw her

2    come in -- get out of the car and shoot twice.  Is that

3    what your testimony is?

4    A.    She got out of the car and she -- the gun -- she shot

5    that gun twice, Mister.

6    Q.    Okay.  But not with this gun?  (Indicating)

7    A.    No, sir.

8    Q.    It was a black gun?

9    A.    I know my color.

10   Q.    Okay.  Okay.  So if there was testimony that linked

11   the bullet that was contained in that man's body to this

12   gun --

13   A.    I don't know.

14   Q.    -- it wasn't this gun because it was a black gun?

15   A.    That's what I seened in her hand.

16   Q.    A black gun?

17   A.    (No response.)

18   Q.    And Michael Ray had gotten out of the car at the same

19   time and was running when she shot twice; is that what

20   you're saying?

21   A.    Off of the passenger side, Mister.

22   Q.    Ma'am?

23   A.    He got out on the passenger side.

24   Q.    And she shot him twice as he run out?

25   A.    He just got out.  He start running and she shot him.

26   Q.    Okay.  If there was testimony that one of those shots

27   was only in the front --

28   A.    I don't know if --

29       MR. ADAMS:

30             Your Honor, I will object as that being

31             argumentative, Your Honor.

32       THE COURT:

                              151

TAPED STATEMENT FROM RODERICK EARL JOHNSON, HE'S A BLACK MALE, 19 YEARS OF AGE.   HIS ADDRESS IS 107 LIBERTY DRIVE, BOGALUSA, LOUISIANA.  TELEPHONE NUMBER IS 725-1174.  THIS TAPE IS BEING TAKEN AT THE BOGALUSA POLICE DEPARTMENT BY MYSELF, DET. RANDY HODGES FROM MR. RODERICK EARL JOHNSON.  TODAY'S DATE IS DECEMBER 14, 1992, THE TIME IS 11:55 P.M.  THIS STATEMENT IS IN REFERENCE TO A SHOOTING IN THE 1100 BLOCK OF POPLAS STREET THAT WAS CALLED INTO THE POLICE DEPARTMENT AT APPROXIMATELY 4:00 P.M. EARLIER THIS SAME DATE WHERE A MICHAEL MYERS WAS SHOT AND KILLED.


HODGES:   RODERICK, I WANT YOU TO JUST START FROM THE BEGINNING AND TELL ME WHERE YOU WERE AND WHAT YOU SAW?

JOHNSON:  ALRIGHT, I WAS STANDING ON MAY'S CORNER....

HODGES:   SPEAK UP A LITTLE BIT LOUDER?

JOHNSON:  I WAS STANDING UP ON MAY'S CORNER, RIGHT THERE BY THE EBERNEZER CHURCH...

HODGES:   ALRIGHT, THAT WOULD BE THE CORNER OF POPLAS STREET AND CHURCH STREET?

JOHNSON:  THAT'S RIGHT.  AND I SAW MIKE JUMPED OUT OF THE CAR, THEY MUST OF SHOT HIM IN THE CAR IN THE LEG CAUSE IT WAS, WHEN HE RAN HE DID THIS HERE, THEN THE WOMAN GOT OUT OF THE CAR AND SHOT HIM.

HODGES:   YOU SAW THE WOMAN SHOOT HIM?

JOHNSON:  I SAW THE WOMAN, I SAW THE BACK, IF I HAD THE PICTURE, I PROBABLY WOULDN'T OF PICKED HER OUT, BUT I SAW THE BACK OF HER. AND I RAN DOWN THERE.  FIRST OF ALL, I HAD MOVED AWAY FROM THE SPOT AND WENT OVER THERE AND WAS STANDING ON MAY'S CORNER, BEHIND THE TELEPHONE POLE, CAUSE I THOUGHT THEY MIGHT WANT TO SHOOT, MIGHT

RODERICK JOHNSON STATEMENT - PAGE -2-

OF WANTED TO SHOOT ME, CAUSE I WAS THE WITNESS TO THE CRIME. BUT THEN THEY PASSED BY, THEN I LIKE TO OF RAN OVER A DUDE ON A MOTORBIKE. SO I RAN DOWN THERE AND TOLD THEM, THEY SHOT MIKE, THEY SHOT MIKE, I RAN DOWN THERE.

HODGES:   WHICH WAY DID THEY TURN?

JOHNSON;  ON CHURCH STREET.

HODGES:   HEADED OUT TOWARD WHERE?

JOHNSON:  FRANKLINTON.

HODGES:   LIKE TOWARDS AUSTIN STREET?

JOHNSON:  YEA, LIKE TOWARDS AUSTIN STREET.

HODGES:   DESCRIBE THE CAR FOR ME, THE BEST YOU CAN?

JOHNSON:  IT WAS BURGUNDY, IT WAS LIKE A BURGUNDY CAVALIER, 4 DOOR AND IT HAD TINTED WINDOWS.

HODGES:   COULD IT HAVE BEEN POSSIBLY BEEN SOMETHING OTHER THAN A CAVALIER?

JOHNSON:  PROBABLY, BUT, IT WAS A FOUR DOOR CAR, IT LOOKED EXACTLY LIKE A CAVALIER, AND IT WAS BURGUNDY, TINTED WINDOWS, AND THAT'S WHEN I, I SAW THE MAN, THE MAN WAS BRIGHT, CAUSE I REMEMBER THE DUDE.

HODGES:   THE MAN, WHICH MAN ARE YOU TALKING ABOUT?

JOHNSON:  THE MAN WHO WAS DRIVING THE VEHICLE.

HODGES:   OKAY, WAS HIS WINDOW UP, DOWN?

JOHNSON:  IT WAS UP. WHEN IT CAME UP, THE FRONT WINDOW, IT AIN'T TINTED, I SAW IN THERE AND I SAW HIM.

HODGES:   OKAY THIS WAS AS HE TURNED THE CORNER THERE AT MAY'S CORNER?

RODERICK JOHNSON STATEMENT - PAGE -3-

JOHNSON:  AS HE TURNED THE CORNER ON MAY'S CORNER.. I SAW HIM AND I RAN DOWN THERE AND I SAW          AND I TOLD HER I SAID MIKE JUST GOT SHOT, MIKE JUST GOT SHOT AND I RAN DOWN THERE AND I WENT DOWN AND I STARTED TALKING TO HIM AND HE WAS STEADY GASPING FOR AIR, STEADY GASPING FOR AIR.  SO I LEFT AND I HAD TOLD OFFICER WOODY, OFFICER SPIKES, I TOLD HIM WHAT I SAW AND I HAD LEFT CAUSE I DIDN'T WANT TO SEE NO MORE.  AND THAT'S WHAT I SAW.  AND IT SAW THAT DUDE RIGHT NOW I WOULD REMEMBER HIS FACE.

HODGES:  OKAY, HAVE YOU EVER SEEN THIS GUY BEFORE, THE ONE THAT WAS DRIVING THE CAR?

JOHNSON:  YES SIR I HAVE.

HODGES:  WHERE?

JOHNSON:  PARKED BY THE CAB STAND.  HE CAME BY THE CAB STAND A COUPLE OF TIMES.

HODGES:  IN THIS SAME CAR?

JOHNSON:  IN THE SAME CAR.

HODGES:  SO, YOU WOULD KNOW HIM IF YOU SAW HIM OR SAW A PICTURE OF HIM?  DO YOU KNOW WHERE HE LIVES?

JOHNSON:  I DON'T KNOW WHERE HE STAYS, BUT WAS HEADED OUT THERE TOWARDS FRANKLINTON.

HODGES:  WE WERE TALKING A LITTLE BIT EARLIER, DIDN'T YOU SAY SOMETHING ABOUT YOU THOUGHT THAT HE LIVED IN FRANKLINTON?

JOHNSON:  NO, I THOUGHT HE STAYED IN MISSISSIPPI.  I THOUGHT HE STAYED IN MISSISSIPPI.  BUT WHEN I HAD TALKED TO TAMP, TAMP KNEW HIM, I WILL TRY TO GET TAMP TO, YOU KNOW.

HODGES:  WHO IS TAMP?

STATEMENT FROM RODERICK JOHNSON - PAGE -4-

JOHNSON:  I DON'T KNOW HIS FIRST NAME.

HODGES:  WHAT RELATION IS HE TO MICHAEL MYERS?

JOHNSON:  A FRIEND.

HODGES:  OKAY.

JOHNSON:  TALKING TO HIM, I LIKE KNOW HIM, HE USE TO TELL ME ALL
THE TIME, HE START COME DOWN HERE  TO SPEND HIS MOMMA MONEY.

HODGES:  BUT THERE IS NO DOUBT IN YOUR MIND THE SAME PERSON YOU
SAW DRIVING THE CAR THAT MICHAEL MYERS WAS SHOT IN, IS THE SAME GUY
THAT YOU SAW AROUND THE CAB STAND BEFORE?

JOHNSON:  I KNOW THAT IS THE GUY.  CAUSE I REMEMBER HIS FACE.  I
KNOW THAT'S THE GUY, IF I HAD A PICTURE RIGHT NOW, I KNOW HIM.

HODGES:  OKAY, ONE MORE TIME, HOW MANY SHOTS DID YOU HEAR?

JOHNSON:  ONE SHOT.

HODGES:  TELL ME ABOUT THE WOMAN YOU SAW?

JOHNSON:  ALRIGHT, I HAD SAW THE WOMAN, SEE LIKE STEPPED OUT THE
CAR.

HODGES:  WHO GOT OUT OF THE CAR FIRST?

JOHNSON:  THE WOMAN.. MIKE, MIKE GOT OUT OF THE CAR FIRST AND
STARTED RUNNING, THEN THE WOMAN HAD GOT OUT OF THE CAR.

HODGES:  MICHAEL GOT OUT FIRST?

JOHNSON:  AND STARTED RUNNING.

HODGES:  HAD YOU HEARD A SHOT ALREADY?

JOHNSON:  NO, I HEARD A SHOT WHEN HE HAD GOT OUT OF THE CAR AND
THAT WOMAN GOT OUT OF THE CAR AND SHOT.

HODGES:  BUT YOU DIDN'T SEE A GUN, YOU JUST SAW..

JOHNSON:  I DIDN'T SEE A GUN, I JUST SEEN A WOMAN GET OUT OF THE

RODERICK JOHNSON STATEMENT - PAGE -5-

CAR AND I HEARD A GUN.

HODGES:   FROM WHERE SHE WAS AT, DO YOU THINK SHE WOULD OF  HAD TO

OF BEEN THE ONE THAT DID THE SHOOTING?

JOHNSON:  YES.

HODGES:   DID YOU SEE HER FACE?

JOHNSON:  I DIDN'T SEE HER FACE.

HODGES:   DESCRIBE HER BEST YOU CAN FOR ME, WHAT YOU DID SEE?

JOHNSON:  I KNOW SHE WAS LIGHT SKINNED, SAME COLOR THAT CHIC IN

THERE.  AND HER HAIR WAS LIKE UP, LIKE, LIKE STUDZ LIKE, IT LOOK

LIKE.

HODGES:   WHAT COLOR WAS HER HAIR?

JOHNSON:  IT WAS BLACK.  BLACK HAIR.

HODGES:   SOLID BLACK OR DID IT HAVE ANY...

JOHNSON:  SHE PROBABLY HAD SOME LITTLE BROWN IN HERE HAIR.  I KNOW

IT WAS BLACK.

HODGES:   HAVE YOU EVER SEEN HER BEFORE?

JOHNSON:  SHE PROBABLY CAME DOWN HERE BEFORE WITH THAT DUDE SEVERAL

TIMES.

HODGES:   BUT YOU DIDN'T REALLY SEE HER FACE TODAY?

JOHNSON:  NO, I DIDN'T REALLY SEE HER FACE.

HODGES:   OKAY, WHEN THE VEHICLE TURNED THE CORNER AT MAY'S CORNER

AND TURNED ON CHURCH STREET AND HEADED OUT TOWARD AUSTIN, HOW MANY

PEOPLE DID YOU SEE IN THE CAR?  THIS WAS AFTER MICHAEL WAS SHOT.

DID YOU SEE THE WOMAN WHEN SHE GOT BACK IN THE CAR?

JOHNSON:  NO, CAUSE I RAN AND GOT BEHIND THE TELEPHONE POLE RIGHT

THERE.

STATEMENT FROM RODERICK JOHNSON - PAGE -6-

HODGES: LET ME ASK YOU THIS, DID SEE GET OUT OF THE BACK DOOR OF THE CAR OR THE FRONT DOOR?

JOHNSON: FRONT.

HODGES: WAS MICHAEL RAY ALSO IN THE FRONT?

JOHNSON: HE WAS GETTING OUT OF THE BACK.

HODGES: OKAY, HE GOT OUT THE BACK AND SHE GOT OUT THE FRONT, IS THAT WHAT YOU ARE SAYING?

JOHNSON: YES SIR.

HODGES: OKAY, ONE MORE TIME, WHEN THEY TURNED THE CORNER HEADED TOWARDS AUSTIN STREET, HOW MANY DID YOU SEE IN THE CAR?

JOHNSON: I SAW TWO PEOPLE, I MIGHT OF SEEN, WELL, I SAW WAS TWO PEOPLE, IT MIGHT OF BEEN THREE PEOPLE IN THE CAR. ALL I SAW, I SAW TWO PEOPLE, THE DRIVER AND THE PASSENGER.

HODGES: IN THE FRONT?

JOHNSON: IN THE FRONT.

HODGES: BUT THERE COULD OF BEEN SOME MORE IN THE BACK, YOU MAY OF NOT HAVE NOTICED, IS THAT WHAT YOU ARE SAYING?

JOHNSON: YES SIR.

HODGES: IS THERE ANYTHING ELSE YOU CAN THINK OF RODERICK?

JOHNSON: NO SIR. THE ONLY THING, I KNOW THAT DUDE, IF I EVER SEE HIM AGAIN, I'LL KNOW HIM.

HODGES: YOU ARE SAYING IF WE CAN GET A PICTURE OF HIM OR FIND THIS GUY THAT YOU CAN DEFINITELY IDENTIFY HIM?

JOHNSON: YES SIR I WILL.

HODGES: OKAY, THIS IS GOING TO CONCLUDE THE TAPED STATEMENT FROM RODERICK EARL JOHNSON, THE TIME NOW IS 12:02 A.M., DEC. 15, 1992.
END OF TAPE  TYPED BY SEARON EVANS 12/21/92

TAPED STATEMENT FROM DOROTHY MALLARD, 22 YEARS OLD, BIRTHDAY, 04-08-70.

ME:  Are you scared of that microphone?

DM:  I don't know.

ME:  A little bit nervous huh? Ok, you were born 04-08-70.

DM:  Yes.

ME:  Here in Columbia, Miss?

DM:  Yes.

ME:  What is your address Dorothy?

DM:  81 Rural Center Lane, Columbia, Mississippi.

ME:  Alright.  PRESENT FOR THIS STATEMENT IS MYSELF, SGT. EDWARDS, CAPTAIN PHILLIP HILL, BOGALUSA POLICE DEPARTMENT AND ANOTHER BLACK FEMALE BY THE NAME OF FELICIA GREEN WHO RESIDES AT 303 RICHARD STREET, SHE IS 24 YEARS OLD, BIRTHDATE IS  07-06-68.

ME:  Ms. Green, do you have a telephone?

FG:  Yes, 736-7772.

ME:  You realize by being in this room while this statement is being taken that you do become a witness to this statement?

FG:  Yes sir.

ME:  With a possibility that you may be called for court?

FG:  Yes sir.

ME:  Do you have any objections to that?

FG:  No sir.

ME:  Alright, the reason that Ms. Green is in this room for this statement is because  Dorothy  Mallard  requests  her  presence  here,  she  feels  more comfortable with her being here.  The statement that Ms. Mallard is about to make is in reference the the shooting death of a b/m in the city of Bogalusa, Louisiana on 12-14-92 by the name of Michael Ray Myers.  The shooting occurred at approximately 10 minutes until 4:00 PM this year 1992, 12-14-92.

ALSO PRESENT FOR THIS STATEMENT IS MR. JAMES CARNEY.  HE IS AN INVESTIGATOR FOR COLUMBIA POLICE DEPARTMENT, MARION COUNTY, MISSISSIPPI.   HE IS ALSO REQUESTED TO BE HERE BY DOROTHY MALLARD.

PAGE 1/PWP/12-21-92

PAGE 2/DOROTHY MALLARD

ME:  Dorothy, if you can just tell me basically what happened the day that Patrick McClendon picked you up.

DM:  Ok...

ME:  Wait a minute.  TODAYS DATE IS 12-16-92, TIME NOW IS 8:00pm. Go ahead.

DM:  Ok, I was laying on the couch asleep, I heard him when he blew the horn but I jumped up and he hadn't made it to the door, he asked me to take a ride with him, I asked him where were we going?

ME:  When you say he, he who?

DM:  Pat

ME:  Pat?

DM:  I have to say his whole name?

ME:  Right, who is Pat?

DM:  Patrick McClendon.

ME:  How long have you known Patrick McClendon?  Two years, three years, months?

DM:  Two or three months.

ME:  You are saying you are home when he comes by?

DM:  Yeh.

ME:  He blows the horn and you come outside and talk to him?

DM:  Ah, yeh, usually I do not get out of bed and go nowhere but yeh, he came and asked me to take a ride with him and I asked him where was we going and he said come on.

ME:  Do you know what time that was?

DM:  It was about, I think it was about a quarter til 3 because Santa Barbara had, I had just dozed off when Another World went off about 2:30 and he came and I thought we was going to New Orleans and we went through, ok, at first I thought we was going to Picyune and then I said no, then I said, we got the the end where those stores and I said, Bogalusa.

ME:  Ok, who was in the car with you, it was Patrick and you and who else?

DM:  "June Baby"

PAGE 2/PWP 12-21-92

DM: I don't know.

ME: Can you describe him to me?

DM: Black, tall..

ME: Fat, skinny, medium build?

DM: Medium.

ME: Medium build, but he is tall, is he taller that me or Mr. Carney?

DM: How tall are you (inaudible)

ME: Ok, he's about Mr. Carneys height?

DM: Yes.

ME: How tall are you Mr. Carney?

JC: About 6'.

ME: About 6', ok, so you are telling me that this guy June Baby is approximately 6' tall. Is he real dark complected or is he light or medium.

DM: (inaudible)

ME: About your complexion, talking about Mrs. Greens complexion?

DM: A little darker than her.

ME: A little darker than her. Be it noted on the tape that Ms. Green is a light complected female and she is saying that she is a little bit darker than her. You are saying that he is about 6' tall, is his hair close cut or is it tall or long or?

DM: It's about this much in the face.

ME: It's about a inch and a what?

DM: It's about this much y'know all the sides is cut off.

ME: The sides are cut off of it?

DM: Can you tell me what he was wearing yesterday, I mean, I'm sorry, Monday?

DM: Neither one of them, I couldn't remember what I was wearing though.

PAGE 3/PWP 12-21-92

PAGE 4/DOROTHY MALLARD

ME: Ok, in this car was you, Patrick McClendon and an individual that you know to be June Baby.  Have you ever met June Baby before?

DM: Yeh, I mean, when he came down here, yeh.

ME: Ok, where is he from, do you know?

DM: No.

ME: You have no idea?  If I told you he was from California, would you have any reason to dispute that?
DM: What now?

ME: If I told you that he was from California, would you have any reason to dispute that?

DM: No.

ME: You don't know if that's where he is from or not?

DM: Well, I heard, well I heard he was from Columbia, I mean California.

ME: (Inaudible, coughing) right now, ok, we're in Columbia.  I'm lost too, I don't know where I'm at.   Alright, you have heard that he is from California.

DM: Umm huh.

ME: But you don't know that for a fact.

DM: No.

ME: Does he have any kin people or anything here?

DM: I guess Pat.

ME: Pat is his kin people.

DM: Yeh.

ME: Is Pat a first cousin to him?

DM: I don't know.

ME: Let me steer from you just one second, Ms. Green, do you know this individual, June Baby?

FG: I met him, I don't know him, I've seen him around.

ME: Is this physical description that she gave, is that about right for him?

PAGE 4/PWP 12-21-92

PAGE 5/DOROTHY MALLARD

FG: Yes.

ME: Have you heard anything about him being from California or anything?

FG: I heard he was from California.

ME: Do you know of any kin people that he may have here.

FG: No.

ME: Do you know of a girlfriend that he may have here?

FG: No.

ME: Alright, go ahead and continue then Dorothy. Alright, you are in the car and going to Bogalusa.

DM: We stopped at the stop sign and we go on and ah, no, we were riding and stopped at the store in New Hope and got some gas, like you ready, asked June was he ready and June said yeh, so I'm saying to myself what are he ready for and we get down there and seen the boy he was coming out of his driveway and told the boy, talked to the boy and Pat were walking and me and June Baby was still sitting in the car, he's sitting, still back there behind...

ME: Ok, just for the purpose of the tape, let me ask you something, ok? Patrick McClendon is driving the car?

DM: Um huh.

ME: The car is a burgandy colored, Delta 88?

DM: Yes, yes yes.

ME: 4 doors, Miss, Marion County tags on the back, Patrick is driving, where are you sitting?

DM: Passenger side.

ME: Passenger side, front?

DM: Um huh.

ME: Anyone else in the car?

DM: Yeh, June Baby.

ME: Where was he sitting at?

DM: Behind Pat.

PAGE 5/PWP 12-21-92

PAGE 6/DOROTHY MALLARD

ME:   Behind Pat, so now you are in Bogalusa, is that right?

DM:   Um huh.

ME:   Alright, tell me what's happening from there.

DM:   Went to the dudes house, Pat talked to him.

ME:   Did you know the dude?

DM:   No.

ME:   You went to somebodys house that you didn't know.

DM:   Yeh.  Somebodys house I didn't know, which I shouldn't have even..

JC:   Can you tell us what the house looked like?

DM:   I don't know if the house was white or what, but I know he had a 5.0
sitting in the yard, a red 5.0, the dude was driving a red little Nissan or
something with a black top on it.

ME:   Ok.

DM:   The dude came back walking.

ME:   Alright, when he came back walking, did he get in the car with ya'll.

DM:   Yeh, he got in the car.

ME:   Let me ask you one thing, ya'll went to his house..

DM:   And the dude was coming out in his car..

ME:   Alright, he's backing out in his car..

DM:   Yeh.

ME:   Alright, why did ya'll go to his house, di ya'll go in there to try and
make a deal for some dope or what?  Or you don't know?

DM:   I guess, like I told you, for me, I guess I was the excuse, y'know they
gonna always take or have a womand somewhere in the middle of it.  So, I
guess they was going to get some dope.

ME:   Ok, they didn't tell you anything, that they was fixing to buy some
dope?

say no, I'm going to borrow it. No. I say, you going to take it? He

ME:  Who said that?

DM:  Pat.

ME:  Patrick.  Alright, so you at the guys house and he's backing out of his driveway in the red Nissan or the 5.0?

DM:  Nissan I guess.

ME:  Ya'll stop him.

DM:  Well he, I guess he knew what Pat was coming for and he stopped.

ME:  Pat gets out of the car?

DM:  Um huh.

ME:  Goes up to him and they talk, what happens then?

DM:  The dude told Pat he would be back, and when he came back he was walking.

ME:  For the purpose of the tape, this dude is going to be Michael Ray Myers. Ok, so Michael Ray leaves and he comes walking back up to the house.

DM:  Uh huh and as he was walking, I seen his car going back up the street somewhere.

ME:  Ok, and then what happens?

DM:  We get to his house..

ME:  He gets in the car with ya'll.

DM:  (inaudible)

ME:  When he gets in the car, where does he sit?

DM:  I don't know..

ME:  He's behind you?

DM:  He's behind me, I ain't even looked back at the dude, I don't even know how the dude looks.  All I seen when he was walking and (this is the house I guess, this is the deadend to his house, ain't this the deadend to his house?

PAGE 7/PWP 12-21-92

PAGE 8/DOROTHY MALLARD

ME: Yes it is.

DM: Turn on, not this street but that first street.  Must have been the second street, That's..

ME: The name of the street where the shooting took place is Poplas Street.

DM: Ok, that's the next street after that first street right there.

ME: One, two the third street up I believe..

DM: But anyway, he pulled the gun out of the dude.

ME: A little bit louder now.

DM: Pat.

ME: Pat pulled a gun out on him, ok.

DM: And, the dude started to take the gun from Pat.

ME: Ok.

DM: As a matter of fact, like I said, I never did look back, but y'know, y'know from the side, you could tell, y'know you could see reaches and stuff the dude was trying to get Pat's gun, and the gun went off, cause when the gun went off, I jumped out of the car, that's when I jumped out, when the gun went off.

JC: Alright, the car was stopped when all this was going on?

DM: Yeh, when they shot, the car was stopped, that's why I jumped out and they was some little kids standing out there, I know, I think it was a little girl, y'konw it was like three or four.

ME: That's correct.

DM: And, I jumped out of the car and when I jumped out of the car the guy was still in the car and when he was shot, I guess he was getting out of the car and he was shot then up there, like I told you...

ME: Wait one second, how do you know he was shot up here?

DM: Cause the gun went off..

ME: Did you turn and look and see that he was shot here or what?

DM: No, Pat.  I said Pat, where did you shoot that dude, he said right there.

PAGE 8/PWP 12-21-92

PAGE 9/DOROTHY MALLARD

ME: Ok, this is after, and you asked him where did you shoot him at and he said right here?

DM: Yeh.

ME: Ok, indicating to the right shoulder area?

DM: Umm, I don't know which was he was, but like I told you the dude was getting out the back seat, the reason why he was shot back here, cause he was getting out the back seat and the gun was held like this.

ME: Who shot him then?

DM: June Baby.

ME: June Baby take the gun from Pat and shoot him?

DM: How many bullets did ya'll find in him?

ME: Two

DM: .25, both of then .25?

ME: Yes.

DM: Ok, it was a small little .25, silver and they, June Baby had a gun this long.

ME: A .38?

JC: June Baby had the larger gun?

DM: What's that a .22.  Are .22 that long?

ME: It could be a long barrel .22 yes.

DM: But that's not a .22.

PH: You don't think it was a .22 that June Baby had?

DM: No, not that big.

PH: Was it real loud when the second shot went off?

DM: To tell you the truth, I didn't hear that second shot but I know that that dude was shot in his booty because when he got out the car he fell and I said, Pat, that dude fell.  Know, didn't you say a bullet came out of him.

ME: Yes.

PAGE 9/PWP 12-21-92

PAGE 10/DOROTHY MALLARD

DM: Well, that was the bullet that came out of him, that, with the black gun.

ME: The one that June Baby had?

DM: Yeh, cause see a 25 bullet travel, right.

ME: Right.

DM: What kind of bullet come right out you?

JC: If it didn't hit any bone or anything it could be a .22 or .25 or

ME: A .38, 357.....

JC: It could be anything cause the guy got shot in the behind and traveled through the meaty part of his behind.

DM: Yeh, ya'll didn't find it right?

JC: No, not that bullet, the other bullet we have.

DM: One, see, that's a .25 bullet, right?

ME: I think so, yeh.

DM: That's the one you found up here?

PH: Yes, and just by looking at the wound in his behind, it doesn't appear that it's a .38 caliber bullet.  Now, they make a .22 that has a 6" barrel and a 9" barrel.

JC: They make .22 on a .38 frame that looks like a .38.

DM: Ok, it was about a .45.

ME: Ok, let's don't worry about the gun part right now, alright, he's out and he's falling down.

DM: Yeh, he, he, he...

ME: And you are outside the car too?

DM: No, I'm still in the car.

ME: At which point did you jumped out of the car?

DM: When he shot.

ME: The first shot, when Pat shot?

PAGE 10/PWP 12-21-92

PAGE 11/DOROTHY MALLARD

DM: Yeh

ME: Ok.

DM: And then, as I was getting in the car he was in.

ME: June Baby shot.

DM: I was in the car and that's when he was shot right here.   That's probably why the kids say that a woman jumped out of the car and shot but...

PH: When you started to get out of the car or you got out of the car, did you say or do anything other than get out of the car?

DM: Huh uh, I got out of the car and I jumped right back inthe car.

PH: Did you say anything?

DM: No.

ME: Think real hard.  Did you say anything at all when you got out of that car?

PH: Did you asked him why he shot him or why they were fighting or anything to that effect?

DM: Yeh, I asked him why did he shoot him and he said he was tousling for his gun.

PH: This is while you were out of the car?

DM: When I got out of the car, I, I just jumped out.  I was so scared then, I was so scared, if I'd stayed down there and ran, that the people down there in Bogalusa would have did something to me.

ME: I understand that, what the Captain was asking you then is when you got out of the car and the first shot went off, and you say you jumped out of the car did you scream, did you holler for help ah, y'know anything, did you say anything all?

DM: No.

ME: Alright, you are getting back in the car and June Baby shoots him in the rear.

DM: Yeh.

ME: Alright, what happens then?

DM: We left.

PAGE 11/PWP 12-21-92

PAGE 12/DOROTHY MALLARD

ME: You left, you drove straight back to Columbia?  Where did you go?

DM: Headed back.

ME: What happened to the guns?

DM: I don't know what happened to nothing, I...

ME: Did they throw them out the window or keep them?

DM: I don't know what they did with them, after I got out of the car with them I came straight to Lisa's house and I told Lisa what happened, and Lisa told me about the dude and ah, y'know everybody talking and stuff.

ME: You went to Hattiesburg you say, and what did ya'll do in Hattiesburg?

DM: Sat around the house, around this dude's house.

ME: Somebody ya'll knew?

DM: Um huh.

ME: Did ya'll discuss it then?

DM: No, we dicussed it on the way to Hattiesburg and well, I did, they wasn't saying nothing, they was acting like it didn't nothing happen but I was y'know, I was thinking like I should jump out of this car, while it was rolling on the road or just something but, y'know if I wasn't so scared that if I jumped out of that car and ran that somebody would have shot me I would have called somebody to come and pick me up right then and there cause after I told Lisa if I'd known they were going to do that I'd never got into the car with them and I told her before I got in that car, I said where was we going and he say we were going to take a ride and I didn't know that they were going to do that to we got to that house.

ME: Let me ask you this, when you got back to Hattiesburg, you went to Lisa's house, who is Lisa? Oh, this is Lisa? Ok, you are Felicia Green, but they call you Lisa?  Alright, you went to her house and you told her what happened, everything that happened?

DM: Um huh.

ME: After that, what happened, you talked to her and did you stay with her that night or did you leave and go someplace else?

DM: Yeh, I stayed with her because I was telling her all night that night that when they find out, I say Lisa, you know they going to look for that woman, I say, I jumped out of the car and there was some little kids standing around and they probably seen me but I don't remember what they had on or what the dude had on.

PAGE 12/PWP 12-21-92

PAGE 13/DOROTHY MALLARD

ME:  What did you have on that night?

DM:  A blue long sleeve shirt and some bluejeans.   I wasn't wearing no
multicolor shirt, that ain't my multicolor shirt (inaudible) either cause I
heard this in the wind about the shirt.   I don't wear multicolor.

ME:  Do you know what that's called?

DM:  What?

ME:  That's called an investigative tactic.

DM:  What, that shirt?

ME:  Yeh, sometimes an investigator will let stuff come out just to confuse
an issue and have the individual thinking, boy he's stupid, he don't know
what he's talking about and then right there at the end put the zinger to
them.

(Inaudible, everybody talking at once)

DM:  I said, no, I said, somebody said that the girl had red hair or bald or
a pony tail and a multicolor shirt.

ME:  How did you have you hair done?

DM:  Slicked back (inaudible)

ME:  In a bun?

FG:  This is a bun.

ME:  That's a bun?  Are you a beautician?

FG:  No.

ME:  You had your hair pulled back, slicked straight back.

DM:  Um huh, I jumped out and I knew, I told Lisa and plus his passenger side
of his car is not tinted so I'm sure a lot of people see now why I'm going
ahead and tell the truth because if I lie, I say Lisa if I go in there and
lie to them and then I turn around and tell the truth, they gonna asked me
why I lied. And she say they gonna understand you scared.

JC:  After Patrick put you out, have you talked to him since, since Monday
night?

DM:  No, yeh.

PAGE 13/PWP 12-21-92

PAGE 14/DOROTHY MALLARD

FG:  (Inaudible, she is talking but is sitting across that room apparently and cannot be heard)

JC:  Yesterday, maybe yesterday morning?  Did you see us out there?

DM:  Yeh, I seen ya'll, I said Lisa, I said look at that black car out there, they fixing to get somebody and I said Lord, they gonna get Pat and they gonna lock him down and I told her I said girl, I said I'm gonna go to jail for something I didn't even do.

ME:  Conclusion, Dorothy Mallard, b/fm, DOB 04-08-70; address 81 Rural Center Lane.  Today's date is 12/16/92, Time 8:25PM.

PAGE 14/PWP 12-21-92

# WARRANT

92-2574

TWENTY-SECOND JUDICIAL DISTRICT COURT

**PARISH OF WASHINGTON**

To the Sheriff or any Legal Officer:

WHEREAS, complaint has been made before me, upon oath, of __Sgt. Glenn McClendon__

charging, one _____ __Dorothy Mallard B/F__

with __Principal to Armed Robbery of Michael Myers   LRS 14:24 and 64__

Now, therefore you are hereby commanded, in the name of the State, to apprehend and arrest the said

accused and bring _____ __Her__ _____ before our Court to answer the said complaint.   You are
further commanded to keep the said accused in safe custody pending a session of the Court, or until released according to law, and this shall be your warrant.

Given under my official signature this __16th__ _____ day of __December__ _____ , 19 __92__

_____
Committing Magistrate

Delta - 80-157

APPENDIX "A"
Adopted October 14, 1976
Effective January 1, 1977
Amended and effective March 14, 1985

UNIFORM APPLICATION FOR POST-CONVICTION RELIEF

| PATRICK MCCLENDON | No. | 93-CR-154452 |
|---|---|---|

NAME OF PETITIONER                              (to be filled in by the clerk)


106727

PRISON NUMBER


**22nd Judicial** JUDICIAL
**District Court** DISTRICT


**L.A. STATE PENITENTIARY**              PARISH OF        **Washington**

PLACE OF CONFINEMENT                     STATE OF LOUISIANA


**N. BURL CAIN, Warden**

CUSTODIAN (Warden,
Superintendent, Jailer, or authorized
person having custody of petitioner)


Please Serve CUSTODIAN and                     **Walter Reed**

DISTRICT ATTORNEY,              JUDICIAL DISTRICT, STATE OF
                    **22nd Judicial** LOUISIANA
                    **District Court**

### INSTRUCTIONS—READ CAREFULLY

(1) This petition must be legibly written or typed, signed by the petitioner and sworn to before a notary public or institutional officer authorized to administer an oath. Any false statement of a material fact may serve as the basis for a criminal prosecution. All questions must be answered concisely in the proper space on the form. Additional pages are not permitted except with respect to the facts which you rely upon to support your claims for relief. No citation of authorities or legal arguments are necessary.

(2) Only one judgment may be challenged in a single petition except that convictions on multiple counts of a single indictment or information may be challenged in one petition.

(3) YOU MUST INCLUDE ALL CLAIMS FOR RELIEF AND ALL FACTS SUPPORTING SUCH CLAIMS IN THE PETITION.

(4) When the petition is completed, the original must be mailed to the clerk of the district Court in the Parish where you were convicted and sentenced.

(5) You must attach official documentation showing your sentence and the crime for which you have been convicted. You may obtain that documentation from the clerk of Court of the district Court of the Parish where you were sentenced or from the institution where you are confined. If that documentation is not attached, you must allege that steps were taken to obtain it.

(6) Petitions which do not conform to these instructions will be returned with a notation as to the deficiency.

### PETITION

1. Name and location of Court which entered the judgment of conviction challenged.

   **22nd Judicial District Court** Judicial District Court, **Parish of Washington**


2. Date of indgment of conviction  **April 15, 1995**

3. Length of sentence **Life**

4. Nature of offense invloved (all counts)   **Second Degree Murder**

5. What was you plea?  (check one)

   (a) Not guilty ( **X** )

   (b) Guilty (   )

   (c) Not guilty and not guilty by reason of insanity (    )

   If you entered a guilty plea to one or more counts and not guilty to other counts, give

   (d) Name and address of the lawyer representing you at your plea (if you had no lawyer, please indicate)   **John Simmons**

   (e) Was the lawyer appointed   **X**  ) or         )? (check one)

6. Kind of trial: (check one)

   (a) Jury ( **X** )

   (b) Judge only   )

7. (a) Name and address of the lawyer representing you at trial;        **John Simmons**

   (b) Was the lawyer appointed   **X**   ) or        )? (check one)

8. Did you testify at trial?        No **X** )

9 (a) Give the name and address of the lawyer who represented you at sentencing for the conviction being attacked herein   **None**

   (b) Was the lawyer appointed        ) or hired        )? (check one)

10  Did you appeal from the judgment of conviction?        Yes   **X** )   No (   )

11  If you did appeal, give the following information:

   (a) Citation, docket number, and date of written opinion by the Supreme Court of Court

   of Appeal (if known)  **State of Louisiana v. Patrick McClendon 686 So.2d 177**

   **State of Louisiana v. Patrick McClendon 695 So.1352 June 20, 1997**

(b) Name and address of lawyer representing you on **Louisiana    Appellate** appeal:                                                                    **Project**

_____

(c) Was the lawyer appointed   X  ) or hired     )? (check one)

12  Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any application for post-conviction relief with respect to this judgment in

any state or federal court?        Yes   X  )   No      )

13.  If your answer to 12 is "yes", give the following information:

(a)  (1) Name of court   **22nd Judicial District**

(2) Nature of proceeding      **Post-Conviction Relief Application**

_____

(3) Claims raised

_____
_____
_____
_____

(4) Did you receive an evidentiary hearing on your application?  )
Yes (       )   No   X  )

(5) Was relief granted or denied?     **Denied**

(6) Date of disposition

(7) Citation of opinion (if known)

(8) Name and address of lawyer representing you (if none, so state):     **None**

_____

(9) Was the lawyer appointed (       ) or hired      )? (check one)

(b)  As to any second application give the same information:

(1) Name of court

(2) Nature of proceeding

_____

(3) Claims raised

_____
_____
_____

(4) Did you receive an evidentiary hearing on your application?  )

Yes (     )   No     )

(5) Was relief granted or denied? _____

(6) Date of disposition _____

(7) Citation of opinion (if known) _____

(8) Name and address of lawyer representing you (if none, so state): _____
_____
_____

(9) Was the lawyer appointed (     ) or hired     )? (check one)

(c) Have you filed any other applications for post-conviction relief with respect to the challenged conviction? Yes (     )   No     )
If "yes", set forth the details (as above) on separate paper and attach.

(d) Did you appeal or seek writs of review from the denial of any post-conviction application?

(1) First petition, etc.   Yes (     )   No     )

(2) Second petition, etc. Yes (     )   No     )

(e) If you did not appeal or seek writs from the denial of any post-conviction application, explain briefly why you did not _____
_____
_____

(f) Name of lawyer who represented you on appeal from the denial of any post-conviction application (if none, so state):

(1) First petition _____

(2) Second petition _____

## CLAIMS FOR RELIEF

State concisely facts supporting your claim that you are being held unlawfully. If necessary, you may attach extra pages stating additional claims and supporting facts. Do not argue points of law.

The following is a list of those claims, and only those claims, that may provide you with grounds for relief:

(1) Your conviction was obtained in violation of the constitution of the United States of the State of Louisiana;

(2) The Court exceeded its jurisdiction;

(3) Your conviction or sentence subjected you to double jeopardy;

(4) The limitations on prosecution had expired;

(5) The statute creating the offense for which you were convicted and sentenced is

unconstitutional;

(6) The conviction or sentence constitute the ex post facto application of law in violation of the Constitution of the United States or the State of Louisiana.

A REMINDER: THE ABOVE LIST CONTAINS ONLY THOSE CLAIMS THAT YOU MAY RAISE FOR RELIEF. YOU MUST SET FORTH ALL OF YOUR COMPLAINTS ABOUT YOUR CONVICTION IN THIS APPLICATION. YOU MAY BE BARRED FROM PRESENTING ADDITIONAL CLAIMS AT A LATER DATE. Remember that you must state the FACTS upon which your complaints about your conviction are based. MERELY CONCLUSORY ALLEGATIONS WILL NOT SUFFICE.

## REPETITIVE APPLICATIONS

The above claims may not provide grounds for relief if any of the following applies to you:

(1) Unless required in the interest of justice, any claim for relief which you fully litigated in an appeal shall not be considered.

(2) Any claim of which you had knowledge and inexcusably failed to raise in the proceeding leading to conviction may be denied by the court.

(3) Any claim which you raised in the trial court and inexcusably failed to pursue on appeal may be denied by the court.

(4) A successive application may be dismissed if it fails to raise a new or different claim.

(5) A successive application may be dismissed if it raises a new or different claim that was inexcusably omitted from a prior application.

This application will provide space for you to explain the reasons why you failed to raise your claims in the proceedings leading to conviction, or failed to urge the claim on appeal, or failed to include the claim in a prior application.

### CLAIM I

Claim: Brady Violation/Deal of Leniency/Prosecutorial Misconduct

_____

(a) Supporting FACTS (tell your story briefly without citing cases or law):

See: Memorandum in Support

_____

_____

_____

_____

(b) List names and addresses of witnesses who could testify in support of your claim. If you cannot do so, explain why: Pierce & Associates-Private Investigations

_____

_____

_____

_____

_____

(c) If you failed to raise this ground in the trial court prior to conviction, on appeal or
in a prior application, explain
why:                          Newly Discovered Evidence                          _____

_____

_____

CLAIM II

Claim: _____

_____

(a) Supporting FACTS (tell your story briefly without citing cases or law):        _____

_____

_____

_____

_____

(b) List names and addresses of witnesses who could testify in support of your claim.
If you cannot do so, explain why: _____

_____

_____

_____

_____

(c) If you failed to raise this ground in the trial court prior to conviction, on appeal or
in a prior application, explain
why:                          _____

_____

## CLAIM III

Claim _____

_____

(a) Supporting FACTS (tell your story briefly without citing cases or law):

_____

_____

_____

_____

(b) List names and addresses of witnesses who could testify in support of your claim.
If you cannot do so, explain why: _____

_____

_____

_____

_____

(c) If you failed to raise this ground in the trial court prior to conviction, on appeal or
in a prior application, explain why: _____

_____

_____

You may attach additional pages setting forth the required information (above) if
additional claims are asserted.

   A.  Do you have in a state or federal court any petition or appeal now pending as to
judgment challenged?   Yes     )  No   X  ) If "yes", name the court _____

   B.  Do you have any future sentence to serve after you complete the sentence
by the judgment challenged?     Yes     )   No   X  )

   (1)  If so, give name and location of court which imposed sentence to be served in

the future: _____

(2) Give date and length of sentence to be served in the future: _____

(3) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future? Yes ( ) No ( )

C.  If a copy of the court order sentencing you to custody is not attached, explain why.

_____
_____
_____

WHEREFORE, Petitioner prays that the Court grant Petitioner relief to which he may be entitled.

_____
Signature of Petitioner

Day/Month/Year

## APPLICATION FOR APPOINTMENT OF COUNSEL

I am unable to employ counsel to represent me in this matter because I have no assets or funds except:  NONE _____

_____
_____
_____
_____

## AFFIDAVIT

STATE OF LOUISIANA

PARISH OF    WEST FELICIANA

PATRICK MCCLENDON , being first duly sworn says that he has read the
(Name of Petitioner)

foregoing application for post-conviction relief and swears or affirms that all of the information therein is true and correct.  He further swears or affirms that he is unable to employ counsel because he has no assets or funds which could be used to hire an attorney except as listed above. [Delete reference to appointment of counsel if inapplicable.]

_____
Signature of Petitioner

SWORN TO AND SUBSCRIBED before me this ____ day of _____ , 2010 .

_____
Notary Public or other person
authorized to administer an oath.

TO:       Clerk of Court, Johnny D. Crain
              P.O. Box 607
              Franklinton, LA 70438-0607

FROM:    Patrick McClendon #106727
              Camp "C" Bear-2
              Louisiana State Penitentiary
              Angola, LA 70712

DATE:    June 4, 2009

RE:       Application for Post Conviction Relief

Dear Hon. Clerk,

      Please find enclosed an original of my *Pro Se* pleadings that I respectfully

request that you docket and file into the record, to wit:

1.    Uniform Application for Post Conviction Relief

2.    Memorandum in Support of Application for Post Conviction Relief

3.    Motion and Order to Compel Answer

4.    Motion and Order for Evidentiary Hearing

5.    Motion and Order to Appoint Counsel

Please also find enclosed another copy of this cover letter that I respectfully ask that

you please "file/date" stamp and return to me in the attached/enclosed, self-addressed,

stamped envelope.

      This matter is *Pro Se* and *In Forma Pauperis.*

Respectfully,

_____

cc:   *file*

PATRICK MCCLENDON                    22ND JUDICIAL DISTRICT COURT

VERSUS                               PARISH OF WASHINGTON

N. BURL CAIN, WARDEN                 STATE OF LOUISIANA

FILED:_____    _____
                                         CLERK OF COURT

## MEMORANDUM IN SUPPORT OF APPLICATION
## FOR POST CONVICTION RELIEF

**MAY IT PLEASE THE COURT:**

NOW INTO COURT comes, Pro Se Petitioner Patrick McClendon, respectfully submitting the following in support of his Application for Post Conviction Relief.

### JURISDICTION

Jurisdiction is vested in this Honorable Court pursuant to *Article 5, § 16* of the Louisiana Constitution of 1974, as amended, which provides that District Courts shall have original jurisdiction of all civil and criminal cases. "An application for post conviction relief shall be by written petition addressed to the district court for the parish in which the petitioner was convicted." *La.C.Cr.P. art. 926.*

### STATEMENT OF THE CASE

Petitioner and codefendant, Anthony M. Bell were charged by grand jury indictment with first degree murder, in violation of La. R.S. 14:30. They pled not guilty and after trial by jury, were found guilty of the responsive offense of second degree murder, a violation of La.R.S. 14:30.1 both men received the mandatory sentence of life without benefit of parole, probation, or suspension of sentence, with credit for time served, in docket no. 93-CR1-54452 Division "E" of the Twenty Second Judicial District Court. Petitioner then appealed to the First Circuit Court of Appeal in docket no. 96-KA-0581 and was denied on December 20, 1996. *State of Louisiana v. Patrick McClendon*, 686 So.2d 177. Petitioner then sought writs in the

Louisiana Supreme Court and was denied on June 20, 1997 in *State of Louisiana v.*

*Patrick Cassius McClendon*, 695 So.2d 1352. Petitioner then executed a Motion for

Contradictory Hearing under LSA C.Cr.P. art. 822 wherein he sought to be provided

with a copy of the prosecutor's file. A hearing on that Motion went forward on

November 12, 1999, following which the trial court ordered the prosecutor to porvide

Petitioner with a copy of original and supplemental police reports and the statements

of witnesses who testified at trial and that the Clerk of Court to provide Petitioner with

a copy of his sentencing transcript and any motions filed on his behalf. The Clerk

complied with the trial court's order as evidenced by his transmittal letter of November

24, 1999. On May 31, 2000 Petitioner then filed an application for post-conviction

relief. The application was denied on July 10, 2000. Petitioner then sought writs to the

First Circuit Court of Appeal and the Louisiana Supreme Court which was denied in

*State ex rel. McClendon v. State*, 811 So.2d 902 (La. 2002). Petitioner then filed for

a Petition for Habeas Corpus on March 25, 2003 which was dismissed with prejudice

on January 9, 2004. Petitioner received new information from Pierce & Associates

concerning State's key witness Dorothy Jo Mallard, the state's witness and now

timely files this second application for Post-Conviction relief under *La.C.Cr.P.art.*

*930.8 A(1)* on June 4, 2009.

## STATEMENT OF THE FACTS

On the day in question it was stated that Patrick McClendon drove his car from

Columbia, Mississippi with co-defendant Nevil Watts and Dorothy Mallard as

passengers. Once in Bogalusa, Louisiana, Michael Myers was spotted by Dorothy

Mallard. Afterwards, Myers got into the car with the suspects.

Meyers was shot and killed. Mallard testified that the shots were fired by

McCendon, with a small weapon, and Watts, with a larger one. However, the

witnesses for the neighborhood did not see either of the alleged perpetrators inside the

3

car. More significantly, one witness by the name of Audrey Martin testified that Mallard jumped from the car right behind the victim and shot the victim. Police located the vehicle in Columbia, Mississippi. The next day, near the house where petitioner was residing with his pregnant girlfriend. Monica Page, the girlfriend said that petitioner did not leave the house between his arrival the night before and when he was arrested. A few days later, on December 17, 1992, the police searched the trailer where petitioner lived with his brother and uncle. Peter McClendon, who lived in the house next to the trailer and Mary McClendon, Mother of petitioner, who lived in the house next to the trailer, both of whom saw Mallard go to the trailer before police went and searched the trailer. The police during the search, found a small caliber weapon in the trailer that Dorothy Mallard could have planted there. However, testing revealed that it was the same weapon used to shoot the victim.

The only witness who testified petitioner fired the alleged shots which killed Michael Meyers was Dorothy Mallard. All other crime witnesses reported the shots were fired by a black female. More significantly, eyewitness Audrey Martin, testified that Dorothy Mallard was the black female suspect that shot the victim in question.

### CLAIM FOR RELIEF

**1. Petitioner's Conviction Violated the United States Constitution, the Louisiana Constitution of 1974 and Clearly Established Federal and State Jurisprudence When the Prosecution Withheld Evidence of the Deal of Leniency/Immunity Made with witness Dorothy Jo Mallard for His Testimony Against Petitioner, in Violation of the Rule of Law Established in Brady v. Maryland, and Petitioner's Rights to Due Process of Law, Fair Trial, Confrontation and Right to Cross-examination, and which would prove petitioner actually innocent.**

### CLAIM #1.

Petitioner, Partick McClendon submits this claim based on newly discovered evidence, evidence unknown to him or the Court of Appeal, at the time of review. Under the provisions of *Article V, Section 16*, the District Court has "original jurisdiction of all criminal and civil matters." *Louisiana Code of Criminal Procedure*

4

*article 924, et seq.,* implements the constitutional authority of a court to issue writs of habeas corpus in connection with an Application for Post-Conviction Relief in a criminal matter. See *State v. Terry,* No. 84-KP-0594 (La. 10/15/84), 458 So.2d 97, 100. The grounds for filing such an application are set forth in *Article 930.3(1).* One such ground is that McClendons' "conviction was obtained in violation of the Constitution of the United States or the State of Louisiana."

First, Petitioner contends that his conviction *was obtained in violation of the Constitution of the United States and the State of Louisiana.* La.C.Cr.P. Art. 930.8 *A(1)* sets forth the procedural requirements this Court is to take into consideration when deciding whether or not to entertain a Petitioner's Application for Post-Conviction Relief. Second, Petitioner maintains that his application should be heard in the interest of justice, in light of the circumstances presented herein, i.e., "newly discovered evidence." Third, Petitioner presents the claim herein under *La.C.Cr.P. art. 930.4 A and La.C.Cr.P. art. 930.8(A)(1).* Also, Petitioner suggests that this claim *is not subject to procedural bar* as the error clearly indicates manifest error and/or abuse of discretion by the Trial Judge, grossly ineffective assistance of Defense Counsel and prosecutor misconduct for withholding crucial Brady Material, and that petitioner is actually innocent of this crime.

Petitioner now files this Application for Post-Conviction Relief in the interest of justice based on the standard enunciated in *State v. Cage,* 637 So.2d 89, as the evidence submitted herein was newly discovered after trial and appeal.

Petitioner's failure to discover this evidence was not due to any lack of diligence. It is material, and it is highly probable that this evidence would have produced a different verdict, had the jury been allowed to hear the evidence. Notwithstanding the probability of a different verdict, *McClendon was denied a fair trial.* The evidence of the deal with Dorothy Jo Mallard was discovered on March 25,

2009. See *Exhibit "A"* a letter from Pierce & Associates showing that the charges were not prsecuted by the district attorney's office in exchange for her testimony against petitioner, and arrest register showing that Dorthy Jo Mallard was arrested on these charges. Again, this shows that Dorothy Jo Mallard had every thing to gain from giving false and perjured testimony. She was identified as the shooter by an eye witness. The prosecution was very selective and careful in questioning Dorothy Jo Mallard as to not let the truth out about her role in this crime, and to seek convictions of both petitioner and his codefendant.

*ACTUAL INNOCENCE*

In *Ward v. Cain*, 53 F.3d 106, 108 (5th Cir. 1995) and see also *Corwin v. Johnson*, 150 F.3d 473 (5th Cir. 1998) "where the petitioner shows as a actual matter, that he did not commit the crime of conviction."

To establish the requisite probability that he was actually innocent, the petitioner must support his allegations with new, reliable evidence that was not presented at trial and must show that is was "more likely than not that no reasonable juror would have convicted him in the light of the new evidence. *Schlup v. Delo*, 513 U.S. 298, 327, 130 L.Ed.2d 808, 115 S.Ct. 851 (1995). In *Schlup* the Honorable Supreme Court states that, "examples of new reliable evidence that may establish factual innocence include exculpatory scientific evidence, credible declarations of guilt by another, **trustworthy eyewitness accounts**, and certain physical evidence."

Unlike the well-known and understood burden of proving guilt beyond a reasonable doubt applicable to all criminal convictions, the concept of proving "factual innocence" is novel and indeed unprecedented in the context of criminal convictions, and even civil proceedings, under Louisiana law. The statute defines the term, as noted above, yet that definition is less than instructive on the type or amount of proof necessary, however, as noted above, the statute also liberally allows for the admission

6

of evidence otherwise inadmissible in the criminal proceeding, suggesting a legislative intent that little limitation be placed on the introduction of evidence related in any way to the conviction and the proof of actual innocence.

To successfully plead actual innocence, a petitioner must show that his conviction resulted from "a constitutional violation." *Schlup v. Delo,* 513 U.S. 298, 327, 130 L.Ed.2d 808, 115 S.Ct. 851 (1995). To do so, he must demonstrate "that more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." In this trial the petitioner was convicted on circumstantial evidence and he is actually innocence, not mere legal insufficiency. *Bousley v. United States,* 523 U.S. 614, 623, 118 S.Ct. 1604,1611, 140 L.Ed.2d 828 (1998).

Petitioner's  failure to discover this evidence was not due to any lack of diligence. It is material, and it is not only highly probable, but the jury in this case would have exonerated defendant and that this evidence would have produced a different verdict, had the jury been allowed to hear all of the available facts and evidence. Notwithstanding the probability of a different verdict, *Patrick McClendon was denied a fair trial.*

District Court could not dismiss federal habeas petition claiming factual innocence on grounds that it was time-barred; under the Antiterrorism and Effective Death Penalty Act's (AEDPA) one-year statute of limitations, without first considering whether  Petitioner was reasonably diligent in pursuing his being actually  innocent of this charge, and if not, whether reasonable diligence was precondition of pressing the actual innocent  claim, whether Petitioner presented a credible claim of actual innocence, and if so, whether the federal constitution required an actual innocence exception to the limitations period for filing habeas petition. *Whitley v. Senkowski,* 317 F.3d 223 (2nd Cir. 2003).

Because incarceration of one that is actually innocent of the crime of which he

7

has been convicted constitutes a grave miscarriage of justice. If a defendant can adduce new evidence in post-conviction proceedings showing that constitutional error probably resulted in the conviction of one who was actually innocent, the court may reach the merits of otherwise defaulted claims asserted in a motion to vacate sentence; in order to meet this standard, however, petitioner is required to establish, by a fair probability, that the trier of facts would have entertained a reasonable doubt of his guilt. 28 U.S.C.A. § 2255. *United States v. Cervini*, 379 F.3d 987 (10th Cir. 2004).

Claims of actual innocence by defendant who seeks to have his conviction and sentenced reviewed it must be viewed in light of the reasonable doubt standard; there must be a showing that no reasonable juror would have found the defendant guilty, which requires a probabilistic determination about what reasonable, properly instructed jurors would do. *28 U.S.C.A. § 2255. United States v. Cervini*, 379 F.3d 987 (10th Cir. 2004).

This Court **must provide a cumulative evaluation of the material evidence,** and all other newly discovered evidence, keeping in mind that petitioner must show that he was convicted on merely circumstantial evidence and with this new evidence, the evidence that the jury was not allowed to hear created an unfair trial.

Evidence of a witness's prior arrest *and of any agreement or deal with the State* by which a witness receives *any benefit or gain* in *exchange for testimony* is admissible to establish bias, prejudice, corruption, or interest against Defendant or party to litigation. *LSA-C.E. arts. 609, 609.1.* Petitioner was deprived of his right to Confrontation when the State withheld evidence of its agreement with a testifying witness, *U.S. Const. Amend. 6.* Petitioner asserts that the Prosecution withheld evidence and mislead the Trial Court because a deal *was in fact made* with Dorothy Jo Mallard *in exchange for her testimony.* The jury should have been aware of this deal as well as petitioner, for impeachment purposes, and for the mere fact that

8

petitioner was entitled to the opportunity to cross examine any witness as to any deals made with the prosecution. Petitioner is entitled to a new trial based upon this material evidence being withheld. Petitioner is also entitled to a new trial based on the fact that the State failed to disclose and/or acknowledge prior to, during, and after trial that a deal was in fact made with Dorothy Jo Mallard. The honorable trial court judge also played a part in the deal as in *tr. tr. p. 16* reads as follows:

Mr. Adams: "yes, I do your Honor. Apparently as part of our cross examination of Ms. Mallard and our ability to impeach her to show that she's received a deal for her testimony, it comes to my knowledge that she was released some four days, after she was arrested on a fifty thousand dollar bond which was apparently set by this court, and I find myself in a position of having to question Mr. Edwards here and possibly the court as to what reason..."

The Court: "you can't question me."

Mr. Adams: "as to what reasons were given for securing a fifty thousand dollar bond in a capital case when none is provided by law. So I am going to have to ask this gentlemen what he told you to request that bond and I am going to have to ask you what he told you."

The Court: "no, you understand you cannot ask a presiding judge questions."

Mr. Adams: "then I have to move for a mistrial, you honor."

The Court: **"that's your problem, it's denied."**

Mr. Adams: "can we perhaps have someone else hear this to make a determination?"

The Court: "No."

Mr. Adams: "Do you have any other remedy that you might suggest to us?"

The Court: "I see no problem to begin with, so there's nothing to remedy."

Mr. Adams: "I see, all right, thank you."

It's a proven fact that the trial court played a role in whatever deal was given Dorothy Jo Mallard and when trial counsel tried to find out about this deal he was not given the information that petitioner should have been entitled to. This establishes bias and prejudice as a matter of law. *Martinez v. Carmana*, 95 N.M. 545, 624 P.2d 54

9

(1981).

The intentional act of withholding material evidence of such magnitude by the State, combined with the intentionally covert and artful questioning of Dorothy Jo Mallard during testimony, and the fact that Dorothy Jo Mallard went to Peter McClendon's trailer just before the police executed a search warrant looking for the gun, and the fact that the officer who supposedly found the gun was not even subpenaed to trial in violation of petitioner's confrontation rights. Dorothy Jo Mallard was seen by an eye witness shooting the victim, then she visits petitioner's trailer and right after, the gun that was involved in the murder is found in that same trailer. The petitioner had never been to the trailer in several days and had no way in the gun getting placed in the trailer. The prosecution needed evidence to show petitioner's involvement in the crime and also to take the blame from Dorothy Jo Mallard and what better way than to have Dorothy Jo Mallard plant the gun in the trailer and then leave and the police show up and they find the gun with no fingerprints.   She also said at first, that she never went to the trailer, then changed her story to say that she went to the trailer but never went in. Then this Honorable Court must take into account that the prosecution never called the officer that found the gun as a witness at trial, denying petitioner his right to confront his accuser concerning the murder weapon. All of this presents the epitome of prosecutorial misconduct. Combined, the presence of prosecutorial misconduct in violation of *Brady v. Maryland* and progeny cases is untenable.

## PROSECUTORIAL MISCONDUCT
### *Law and Argument*

In the present case, Petitioner avers his conviction and sentence were obtained in violation of his 5th, 6th, and 14th Amendment Rights under the United States Constitution, Louisiana Constitution of 1974, and Louisiana Statutory Law, as a result of knowing and intentional Prosecutorial Misconduct.

When presenting a claim of prosecutorial misconduct, a Petitioner must show that the actions of the prosecutor so infected the trial with unfairness as to make the resulting conviction a denial of Due Process, and "the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial." *Kutzner v. Johnson*, 242 F.3d 605, 609 (5th Cir. 2001); *United States v. Bagley*, 473 U.S. 667, 676, 105 S.CT. 3375, 87 L.Ed.2d 481 (1985).

In this case, the prosecution knew that the original statement and trial testimony of Audrey Martin who testified that she did in fact see a gun in the hand of Dorothy Jo Mallard, on page 182 T.Tr. Line15:

A. "but I did see her shoot Michael" and on lines 16-17

Q. "Did she shoot him once or twice?"

A. "The gun went off twice, I don't know if the second bullet hit. I really don't know that, but I know she shot him and he fell."

Additionally, in Dorothy Jo Mallard's initial statement to police she stated that "she got out of the car when the first shot was fired, but then she states that she got back in the car". Then when Dorothy Jo Mallard was dropped off, she said she then went to the home of Felicia Green and talked about the crime all night. Then the next day when police was trying to locate her Dorothy Jo Mallard was located in the Mall, where she had gone to get her hair done. She never tried to contact police nor did she ever try to leave the scene. She said in her own words that she got out of the car but then she admits that she got back in on her own. Then once she gets dropped off, she doesn't go to police but instead, she goes to Felicia Green's house and spends the night talking about what happened and then the next day, she goes to the Mall to get her hair done. She never tried to contact police or go to the police. This doesn't appear to be a woman who was afraid for her life. Then after her arrest for First Degree Murder and Armed Robbery, she has someone from the prosecutor's office, and sheriff's department call and get her a bond set at fifty thousand dollars, in order to

11

do this, they would have had to inform the same trial court as to why they were asking for a bond for a person who was seen by an eye witness, shooting the vicitm, as nobody would ever get a bond set for these type of charges. This in itself shows that the prosecution was trying to get a witness to help seek a conviction against petitioner, and the trial court knew and played a role in this deal. The defense and petitioner should have been privedged to this deal in order to properly cross examine Dorothy Jo Mallard.

The Supreme Court has recognized that prosecutorial misconduct may "so infect the trial with unfairness as to make the resulting conviction a denial of Due Process," *Greer v. Miller*, 483 U.S. 756, 765, 107 S.CT. 3102, 97 L.Ed.2d 618 (1987)(quoting *Donnelly v. DeChristophoro*, 416 U.S. 637, 643, 94 S.CT. 1868, 40 L.Ed.2d 431 (1974). The appropriate standard of review is the narrow one of Due Process and not the broad exercise of supervisory power. *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.CT. 2464, 91 L.Ed.2d 144 (1986).

Petitioner maintains that this case *clearly* exhibits that the Prosecutorial Misconduct presented herein so infected the trial with unfairness that he was denied Due Process, and the Misconduct was of sufficient significance resulting in the denial of a fair trial.

1.    *The Brady Rule*:

The State's failure to disclose material favorable to a criminal defendant implicates more than the defendant's discovery rights; the prosecutor has an affirmative duty to disclose such evidence under the Fourteenth Amendment's Due Process Clause. Failure to reveal this evidence implicates the defendant's right to a fair trial. *U.S. v. Agurs*, 427 U.S. 97, 96 S.CT. 2329 (1976); *State v. Ortiz*, 567 So. 2d 81 (La.1980); *State v. Falkins*, 356 So. 2d 415 (La.1978), *certiorari denied* 439 U.S. 865, 99 S.CT. 190 (1978).

12

The suppression of evidence favorable to an accused by the prosecution when requested, violates Due Process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 83 S.CT. 1194, 10 L.Ed.2d 215 (1963); *See* also, *State v. Knapper*, 579 So. 2d 956 (La.1991); *State v. Rosiere*, 488 So. 2d 965 (La.1986).

In *U.S. v. Bagley*, 473 U.S. 667, 676, 105 S.CT. 3375, 3380 (1985), the Court held that under *Brady*, there was no distinction between exculpatory evidence and impeachment evidence. *See, State v. Ortiz, supra. Bagley* abandoned the second and third distinctions of *Agurs* and established that, regardless of whether a request is made, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.*, 473 U.S., 682. A reasonable probability was defined as "a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667; 105 S.CT. 3375; 87 L.Ed.2d 481 (1985). See also *Knapper*, 579 So. 2d at 959; *Rosiere*, 488 So. 2d at 970-971.

The Supreme Court clarified: there are three components of a true *Brady* violation: (1) The evidence at issue must be favorable to the accused; either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State either willfully or inadvertently; and (3) prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263, 119 S.CT. 1936, 144 L.Ed.2d 286 (1999).

II.    *The Three Elements of Strickler in Establishing a Brady Violation:*

(A)   Beyond debate, the first such element of *Strickler v. Greene, supra*, in establishing a Brady violation – that the evidence be favorable to the accused as exculpatory or impeaching – is evident in this case, i.e., the deal made with Dorothy Jo Mallard in exchange for her   testimony.   The above evidence is *favorable, exculpatory*, and *impeaching*. Disclosure of the above evidence to competent counsel

13

would have resulted in a markedly weaker case for the prosecution and there is more than a 'reasonable probability' that the outcome would have been different had this evidence been presented and heard by the fact finding jurors.

(B)     Regarding the second *Strickler* component in establishing a *Brady* violation, Shaw shows cause when his failure to develop facts in State-Court proceedings was due to the State's suppression of the evidence. Nowhere in the record can it be seen that the prosecution ever mentioned the *DEAL*, and Defense Counsel's actions and/or inactions exacerbated those of the prosecution. In any event, prosecutors are responsible for "any favorable evidence known to the others acting on the government's behalf in the case, including the police." When police or prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight. *Kyles v. Whitley*, 514 U.S. 419, 115 S.CT. 1555, 131 L.Ed.2d 490 (1995). Nowhere in the record is there *anything* to support that the prosecution ever mentioned that the deal existed.

(C)     Coincident with the third Strickler component in establishing a *Brady* violation -- that prejudice ensued – prejudice within the compass of the "*cause and prejudice*" requirement exists when suppressed evidence is "*material*" for Brady purposes. The materiality standard for *Brady* claims is met when "the favorable evidence could reasonably be taken to put the whole case in a different light as to undermine the confidence of the outcome." *Kyles*, at 435. To be sure, this evidence would have put the whole case in a different light. This evidence was *pertinent*, *advantageous*, and *exculpatory* to the defense. In verity, had the fact finding jurors been presented with evidence of extreme leniency, and the fact that all those charges were dropped and testimony known to be false were corrected, there is more than a reasonable probability that this would have altered the outcome of the proceedings.

Petitioner asserts the State knew of, but kept back, the deal made with Dorothy

14

Jo Mallard. It was incumbent on the prosecution to disclose *Brady* material and McClendon cannot be faulted for relying on that. See *Strickler*, 527 U.S., at 283-284, 119 S.CT. 1936.

This Court must provide a cumulative evaluation of the suppressed evidence, keeping in mind that McClendon does not have to show that, with the addition of the suppressed evidence, his trial would have resulted in acquittal or that there would be insufficient evidence to support a conviction. McClendon need only show that "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable." *Kyles*, 115 S.CT. at 1569.

In support, McClendon cites *State v. Bailey*, 367 So.2d 368 (La. 1979), wherein, the State failed to disclose impeachment evidence against the State's only witness concerning any deals he may have made with the State concerning his arrest on a other charges before trial. The State also failed to tell him that it had arranged for the release of the witness *without bail* pending the trial, and then did not seek to have the witness jailed until some days after trial when some other party complained to a magistrate. The defendant was convicted, and when he learned of these facts, he filed a motion for new trial contending that his *Brady* rights had been violated. The trial court denied the motion, and the defendant appealed. On appeal, the Court reversed the defendant's conviction and sentence, granting him a new trial.

Similarly here, the state's star witness and the only witness to put the gun in petitioner's hand, had her bond set at $50,000.00 and she had no constitutional right to even have a bond. The Court cited *Brady v. Maryland*, 373 U.S. 83, 83 S.CT. 1194, 10 L.Ed.2d 215 (1963) for the general rule that the State's failure to disclose material evidence which is favorable to the defense justifies the granting of a new trial. The Court also cited *Giglio v. United States*, 405 U.S. 150, 92 S.CT. 763, 31 L.Ed.2d 104 (1972), which extended *Brady* to evidence that would damage the credibility of

the State's witnesses. Quoting from *Giglio*, the Court noted:

> When the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure of evidence affecting credibility falls within this general rule. . . Moreover, whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor.

*Bailey*, at 370. The Court then quoted from *United States v. Agurs*, 427 U.S. 97, 96 S.CT. 2392, 49 L.Ed.2d 342 (1976):

> "The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance must be sufficient to create a reasonable doubt."

*Bailey*, at 370-371. The Court found that the defendant "could very probably have negated, to a considerable extent, the credibility of this important state witness" which would have created a reasonable doubt if he had been aware of the evidence which the State withheld from the Court.

In addition to the promise of extreme leniency, in the form of the charges of First Degree Murder and Armed Robbery were at first, reduced to Principal to First Degree Murder and Principal to Armed Robbery and then dropped, Dorothy Jo Mallard's trial testimony was totally unreliable and false. Detectives and prosecutor's knew that her testimony and statements were totally unreliable, yet the prosecution chose to allow her to testify in order to obtain the conviction.

A close review of the record is indicative of the prosecution suppressing some evidence, and manufacturing and/or manipulating other evidence, and allowing testimony known to be false to stand uncorrected. This is a violation of McClendons' 5th, 6th, 8th, and 14th Amendment rights under the United States Constitution and Article I, Sections 2, 13, 14 and 16, of the Louisiana Constitution.

As a result of the State's failure to disclose, McClendon was denied his right to

16

present a defense, right to *adequate* cross-examination, right to *full* confrontation and a fair trial having a just and reliable outcome. The State knew of, but kept back, that it was in collusion with Dorothy Jo Mallard. McClendon trusted the prosecution would not engage in improper litigation conduct to obtain a conviction.

The Court observed in *Strickler*, defense counsel has no "procedural obligation to assert constitutional error on the basis of mere suspicion that some prosecutorial misstep may have occurred." 527 U.S., at 286-87, 119 S.CT. 1936. "Ordinarily, we presume that public officials have properly discharged their official duties." *Bracy v. Gramley*, 520 U.S. 899, 909, 117 S.CT. 1793 (1997) (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15, 47 S.CT. 1 (1926) (internal quotation marks omitted).

The Court has several times underscored the "special role played by the American prosecutor in the search for truth in criminal trials." *Strickler*, 527 U.S. at 281, 119 S.CT. 1936; *Kyles*, 514 U.S. at 439-440, 115 S.Ct. 1555; *United States v. Bagley*, 473 U.S. 667, 675, n.6, 105 S.Ct. 3375 (1985); *Berger*, 295 U.S., at 88, 55 S.Ct. 629. See also: *Olmstead v. United States*, 277 U.S. 438, 484, 48 S.Ct. 564 (1928) (Brandeis, J. Dissenting). Courts, litigants, and juries properly anticipate that "obligations [to refrain from improper methods to secure a conviction] . . . plainly rest[ing] upon the prosecuting attorney, will be faithfully observed." *Berger*, 295 U.S., at 88, 55 S.CT. 629. A Prosecutor's dishonest and unwarranted concealment should attract no judicial approbation. *Kyles*, 514 U.S., at 440, 115 S.CT. 1555 ("The prudence of the careful prosecutor should not . . . be discouraged.").

The existence of prejudice in this case is marked. It is untenable that one could conclude that Patrick McClendon received a *fair trial*, given the jury's ignorance of the fact that the State was in collusion with Dorothy Jo Mallard concerning the deal made with her, and withheld the same. It cannot be said with any noticeable amount

of confidence that had the jury known these facts, the verdict would have been the same. Of course, we will never know because the State cheated. Without these facts, the truth will never be manifest.

## CONCLUSION

WHEREFORE, petitioner contends that he has shown that the prosecution has violated discovery and this violation if of constitutional dimensions. His right to a fair and partial trial has been taken away by this misconduct by the district attorney's office, by discovery violations. The district attorney's office should have turned over all exculpatory material in petitioner's criminal trial, especially deals made with witnesses, the fact that the prosecution solicited false testimony from Dorothy Jo Mallard, and allowed her trial testimony to go uncorrected.

## PRAYER FOR RELIEF

Mr. Patrick McClendon prays that this Honorable Court grants his Application for Post Conviction Relief, grants him a new trial, with proper discovery and grants relief that he has available to him due to the errors presented herein and any other such relief this Honorable Court deems appropriate.

Respectfully submitted this 4th day of June, 2009.

Patrick McClendon #106727
Camp "C" Bear-2
Louisiana State Penitentiary
Angola, LA 70712

## AFFIDAVIT / CERTIFICATE OF SERVICE

I, Patrick McClendon, hereby swear and aver that the foregoing is true and correct to the best of my knowledge and belief. I, Patrick McClendon, hereby further swear and aver that a copy of the foregoing has been served upon counsel for the Respondent, Walter Reed, D.A., Parish of Washington, by placing a copy of same in

18

the U.S. Mail, properly addressed and postage pre-paid.

Done this 4th day of June, 2009.

_____

Patrick McClendon #106727

PATRICK MCCLENDON               22ND JUDICIAL DISTRICT COURT

VERSUS                                  PARISH OF WASHINGTON

N. BURL CAIN, WARDEN            STATE OF LOUISIANA

FILED:_____          _____
                                      CLERK OF COURT

### MOTION TO COMPEL ANSWER

Petitioner, Patrick McClendon respectfully avers that the allegations presented herein, if established would entitle him to post conviction relief, and respectfully moves this Honorable Court to require the District Attorney for the Parish of Washington, State of Louisiana, to file an answer in opposition within the period specified pursuant to *La C.Cr.P. art. 927(A)*.

Respectfully submitted this 4th day of June, 2009.

                                _____
                                Patrick McClendon #106727
                                Camp "C" Bear-2
                                Louisiana State Penitentiary
                                Angola, LA 70712

### ORDER

IT IS HEREBY ORDERED that the District Attorney for the Parish of Washington, State of Louisiana, file an answer to the foregoing Application for Post Conviction Relief on or before the _____ day of _____, 2009.

Done this _____ day of _____, 2009.

      _____
         JUDGE - 22ND JUDICIAL DISTRICT COURT

PATRICK MCCLENDON        22ND JUDICIAL DISTRICT COURT

VERSUS        PARISH OF WASHINGTON

N. BURL CAIN, WARDEN        STATE OF LOUISIANA

FILED:_____

       _____
       CLERK OF COURT

## MOTION FOR EVIDENTIARY HEARING

Petitioner, Patrick McClendon respectfully avers that the allegations presented herein, if established would entitle him to post conviction relief, and respectfully moves this Honorable Court to hold an Evidentiary Hearing where the facts and law concerning this newly discovered evidence that was withheld by the state may be more fully developed to aid this Honorable Court in rendering a decision regarding Petitioner's claims for relief.

Respectfully submitted this 4th day of June, 2009.

       _____
       Patrick McClendon #106727
       Camp "C" Bear-2
       Louisiana State Penitentiary
       Angola, LA 70712

## ORDER

IT IS HEREBY ORDERED that Petitioner be allowed to supplement his memorandum as necessary.

IT IS HEREBY FURTHER ORDERED that an Evidentiary Hearing be held on the _____ day of _____, 2009, at _____ A.M./P.M. whereby the facts and law may be more fully developed to aid this Honorable Court in rendering a decision regarding Petitioner's claims for relief.

IT IS HEREBY FURTHER ORDERED that Burl Cain, Warden, Louisiana State Penitentiary, produce Petitioner, Patrick McClendon #106727, concurrently confined under his custody and control, before the Honorable 22nd Judicial District

Court, Parish of Washington, on the _____ day of _____,

2009, as previously ordered by this Court.


      Done this _____ day of _____, 2009.


_____

JUDGE - 22ND JUDICIAL DISTRICT COURT

PATRICK MCCLENDON                    22ND JUDICIAL DISTRICT COURT

VERSUS                               PARISH OF WASHINGTON

N. BURL CAIN, WARDEN                 STATE OF LOUISIANA

FILED:_____            _____
                                            CLERK OF COURT

### MOTION FOR APPOINTMENT OF COUNSEL

Petitioner respectfully submits that he is unlearned and unskilled with respect to legal matters having had no formal training, is not an attorney, counsel or paralegal, and has no practical experience in such matters.

Petitioner respectfully submits that only with the aid of Counsel will he be able to more fully develop the law and facts concerning this discovery violation before this Honorable Court during the upcoming Evidentiary Hearing regarding his claims and to ensure that his rights are protected.

Petitioner respectfully submits that he is indigent in this matter due to his incarceration, having no means of his own to retain Counsel to represent him during these proceedings regarding his Application for Post Conviction Relief.

Respectfully submitted this 4th day of June, 2009.


                              _____
                              Patrick McClendon #106727
                              Camp "C" Bear-2
                              Louisiana State Penitentiary
                              Angola, LA 70712

### ORDER

IT IS HEREBY FURTHER ORDERED that _____,

Attorney at Law, _____,

is hereby appointed to represent Petitioner, Patrick McClendon during the evidentiary proceedings regarding Petitioner's Application for Post Conviction Relief.

IT IS FURTHER ORDERED that said attorney shall file any and all required

pre-hearing motions and filings on behalf of the Petitioner, Patrick McClendon for the

purpose of protecting rights during the evidentiary proceedings regarding Petitioner's

Application for Post Conviction Relief.

    Done this _____ day of _____, 2009.


_____
JUDGE -22ND JUDICIAL DISTRICT COURT

24

STATE OF LOUISIANA     NUMBER: 93 CR1 54452

VERSUS     22ND JUDICIAL DISTRICT COURT

    PARISH OF WASHINGTON

PATRICK MCCLENDON     STATE OF LOUISIANA

FILED: _____

           DEPUTY CLERK

### ORDER DISMISSING PETITION FOR POST-CONVICTION RELIEF

Petitioner, Patrick McClendon, filed an application for Post Conviction Relief in the above captioned matter on March 31, 2010, and a Memorandum in Support on March 5, 2010, asserting that his claims fall within an exception to La. C.Cr.P. Art. 930.8.

Petitioner's conviction became final on June 20, 1997, the date upon which the Louisiana Supreme Court denied petitioner's writ.  Petitioner thereafter filed original and supplemental applications for Post Conviction Relief on June 2, 2000 and June 26, 2000, respectively, which were dismissed on July 10, 2000, and denied on rehearing on August 16, 2000.  The current application alleges that the facts upon which petitioner's first claim is predicated just become known to petitioner, and that the second claim is based upon a new ruling of law governing confrontation as set forth in the Supreme Court's ruling in *Melendez-Diaz v. Massachusetts*, 129 S.Ct. 2527, 174 L.Ed.2d. 314 (2009).

The Court has reviewed the petition and the record of this matter, and finds that petitioner has failed to prove grounds which would entitle him to relief.

Accordingly, under Louisiana Code of Criminal Procedure Article 929, the relief sought must be denied.

IT IS HEREBY ORDERED that the Petition for Post Conviction Relief filed by Patrick Mclendon on March 31, 2010 be denied.

IT IS FURTHER ORDERED that the Clerk of Court of the Parish of Washington give notice of this dismissal to petitioner, the District Attorney for the Parish of Washington, and the petitioner's custodian.

Franklinton, Louisiana, this __17__ day of May, 2010.

HONORABLE ALLISON H. PENZATO

A True Copy of Original
This 5-24-10
By, Clerk of

IN THE
FIRST CIRCUIT COURT OF APPEAL
STATE OF LOUISIANA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

NUMBER _____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PATRICK MCCLENDON
Petitioner

VS.

N. BURL CAIN, WARDEN,
Louisiana State Penitentiary
Respondent

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
APPLICATION FOR SUPERVISORY WRIT FROM THE DENIAL OF POST
CONVICTION RELIEF,
CRIMINAL NO. 93-CR1-54452, DIVISION "E" FROM THE
22ND JUDICIAL DISTRICT COURT, PARISH OF WASHINGTON,
JUDGE ALLISON H. PENZATO
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**APPLICATION FOR SUPERVISORY WRIT
OF REVIEW**

ON BEHALF OF PATRICK MCCLENDON
PRO SE PETITIONER

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORIGINAL BRIEF ON THE MERITS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

RESPECTFULLY SUBMITTED BY
PATRICK MCCLENDON #106727
CAMP "C" BEAR 2
LOUISIANA STATE PENITENTIARY
ANGOLA, LA 70712

CRIMINAL PROCEEDING

## STATEMENT OF JURISDICTION

The Louisiana Appellate Courts has supervisory jurisdiction over this criminal proceedings from denial of District Courts on Post-Conviction, pursuant to Article 5, § 10 of the Louisiana Constitution of 1974, as amended. LSA-Const. Art. 5, Sec. 10 (1996).

## STATEMENT OF THE CASE

Petitioner and codefendant, Nevil Watts were charged by grand jury indictment with first degree murder, in violation of *La. R.S. 14:30*. They pled not guilty and after trial by jury, were found guilty of the responsive offense of second degree murder, a violation of *La.R.S. 14:30.1* both men received the mandatory sentence of life without benefit of parole, probation, or suspension of sentence, with credit for time served, in docket no. 93-CR1-54452, Division "E" of the Twenty Second Judicial District Court. Petitioner then appealed to the First Circuit Court of Appeal in docket no. 96-KA-0581 and was denied on December 20, 1996. *State of Louisiana v. Patrick McClendon*, 686 So.2d 177. Petitioner then sought writs in the Louisiana Supreme Court and was denied on June 20, 1997 in *State of Louisiana v. Patrick Cassius McClendon*, 695 So.2d 1352. Petitioner then executed a Motion for Contradictory Hearing under *LSA C.Cr.P. art. 822* wherein he sought to be provided with a copy of the prosecutor's file. A hearing on that Motion went forward on November 12, 1999, following which the trial court ordered the prosecutor to provide Petitioner with a copy of original and supplemental police reports and the statements of witnesses who testified at trial and that the Clerk of Court to provide Petitioner with a copy of his sentencing transcript and any motions filed on his behalf. The Clerk complied with the trial court's order as evidenced by his transmittal letter of November 24, 1999. On May 31, 2000 Petitioner then filed an application for post-conviction relief. The application was denied on July 10, 2000. Petitioner then sought writs to the First Circuit Court of

-1-

Appeal and the Louisiana Supreme Court which was denied in *State ex rel.
McCleudon v. State*, 811 So.2d 902 (La. 2002). Petitioner then filed for a Petition for
Habeas Corpus on March 25, 2003 which was dismissed with prejudice on January 9,
2004. Petitioner now raises a Sixth Amendment Violation from the recently decided
case of *Melendez-Diaz v. Massachusetts*, 129 S.Ct. 2527 (2009) and from new
information from Pierce & Associates concerning State's key witness Dorothy Jo
Mallard, and the initial Taped Statement from Roderick Johnson, two of the state's
witnesses and then timely filed his second application for Post-Conviction relief under
*La.C.Cr.P.art 930.8 A(2) & La.C.Cr.P.art. 930.8 A(1)* on February 26, 2010, based
upon a new ruling of law and newly discovered evidence that was withheld from
Petitioner and his defense attorney. The District Court submitted an order Dismissing
Petitioner's petition for Post-Conviction Relief without a proper ruling under
La.C.Cr.P.Art. 929 on May 17, 2010, *See Exhibit "T"*, Petitioner now timely files his
Application for Supervisory Writs on June 4, 2010.

### STATEMENT OF THE FACTS

On the day in question it was stated that Patrick McCleudon drove his car from
Columbia, Mississippi with co-defendant Nevil Watts and Dorothy Mallard as
passengers. Once in Bogalusa, Louisiana, Michael Myers was spotted by Dorothy
Mallard. Afterwards, Myers got into the car with the suspects.

Meyers was shot and killed. Mallard testified that the shots were fired by
McCleudon, with a small weapon, and Watts, with a larger one. However, the
witnesses from the neighborhood did not see either of the alleged perpetrators inside
the car. More significantly, one witness by the name of Audrey Martin testified that
Mallard jumped from the car right behind the victim and shot the victim. Police located
the vehicle in Columbia, Mississippi. The next day, near the house where petitioner
was residing with his pregnant girlfriend. Monica Page, the girlfriend said that

-2-

petitioner did not leave the house between his arrival the night before and when he was arrested. A few days later, on December 17, 1992, the police searched the trailer where petitioner lived with his brother and uncle. Peter McClendon, who lived in the house next to the trailer and Mary McClendon, Mother of petitioner, who lived in the house next to the trailer, both of whom saw Mallard go to the trailer before police went and searched the trailer. The police during the search, found a small caliber weapon in the trailer that Dorothy Mallard could have planted there. However, testing revealed that it was the same weapon used to shoot the victim.

The only witness who testified petitioner fired the alleged shots which killed Michael Meyers was Dorothy Mallard. All other crime witnesses reported the shots were fired by a black female. More significantly, eyewitness Audrey Martin, testified that Dorothy Mallard was the black female suspect that shot the victim in question. In the initial taped statement from Roderick Johnson, he stated that the black female shot the victim, however, at trial he changed his initial statement as a prosecution witness against Petitioner.

## CLAIMS FOR RELIEF

**1. Petitioner's Conviction Violated the United States Constitutional Confrontation Clause in allowing the Coroner to Testify over Defense Counsel's Objection, Denying Petitioner his Right to Confrontation.**

**2. Petitioner's Conviction Violated the United States Constitution, the Louisiana Constitution of 1974 and Clearly Established Federal and State Jurisprudence When the Prosecution Withheld Evidence of the Deal of Leniency/immunity Made with Witness Dorothy Jo Mallard for Her Testimony Against Petitioner, and for the Prosecution Withholding Evidence of the Deal of Leniency/immunity Made with Witness Roderick Earl Johnson's for His Trial Testimony, in Violation of Petitioner's Rights to Due Process of Law, Fair Trial, Confrontation and Right to Cross-examination, and Which Would Prove Petitioner Actually Innocent.**

## CLAIM #1

Petitioner, Patrick McClendon submits this claim based upon a new ruling of law governing Confrontation based upon the New ruling in *Melendez-Diaz v. Massachusetts*, 129 S.Ct. 2527 (2009) where the United Supreme Court held that

*(1) analysts certificates of analysis were affidavits within core class of testimonial statements covered by Confrontation Clause;*

*(2) analysts were not removed from coverage of Confrontation Clause on theory that they were not "accusatory" witnesses;*

*(3) analysts were not removed from coverage of Confrontation Clause on theory that they were not conventional witnesses;*

*(4) analysts were not removed from coverage of Confrontation Clause on theory that their testimony consisted of neutral, scientific testing;*

*(5) certificates of analysis were not removed from coverage of Confrontation Clause on theory that they were akin to official and business records; and*

*(6) defendant's ability to subpoena analysts did not obviate state's obligation to produce analysts for cross-examination.*

In the case at hand Petitioner's counsel objected at trial during cross-examination of Dr. Roger Casama the coroner of Washington Parish who testified at trial that he is an expert in the field of forensic medicine. T.Tr.P. 18, Lines 25,25..

On T.Tr.P. 20, Lines 28-32, defense counsel objected to this doctor making conclusions concerning the autopsy when he in fact was not the doctor who performed the autopsy. All Dr. Roger Casama did was pronounce the victim dead. T.Tr.P. 21, Lines 5-15, the defense again objected on another ground, that they were being denied the right to confront the person who performed the autopsy. Then, when questioned about the immediate cause of death, the defense counsel again objected as Dr. Casama was testifying about what another doctor saw. T.Tr.P. 21, Lines 29-32.

On T.Tr.P. 23, Lines 14-21, the defense objected to the fact that Dr. Casama made a recitation and testified as to a report that he did not do, therefore denying the defense the opportunity to confront a crucial witness.

In *Melendez-Diaz v. Massachusetts*, 129 S.Ct. 2527 (2009), the objections feel

-4-

within the core class of testimonial statements governed by the confrontation clause.

Similarly here, Petitioner's counsel objected to all the trial testimony of Dr. Casama for being second hand information and denying the defense of the opportunity to confront a crucial witness.

Under *Crawford*, a witness's testimony against a defendant is inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination. 541 U.S. at 54, 124 S.Ct. 1354.

The testimony in the instant case was from a report done by a person different than the person testifying. Dr. Casama was merely testifying to what someone else discovered and could in no way satisfy the Sixth Amendment Confrontation Rights afforded to the Petitioner.

The Sixth Amendment to the United States Constitution, made applicable to the States via the Fourteenth Amendment, *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), provides that "[i]n all criminal prosecutions, the accused shall enjoy the right... to be confronted with the witnesses against him." in *Crawford*, after reviewing the Clause's historical underpinnings, we held that it guarantees a defendant's right to confront those "who bear testimony" against him. 541 U.S. at 51, 124 S.Ct. 1354. A witness's testimony against a defendant is thus inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination. Id,. At 54, 124 S.Ct. 1354.

Simply put, in a case such as this, where two witnesses right after the shooting, state that they saw the victim get out of the car, and then saw a female exit the car and shoot the victim. The prosecution's theory was that the shot came from within the car and after getting Roderick Johnson to change his initial statement,(See: Exhibit "C" where he stated that he saw the woman shoot the victim) to say that he heard a shot fired after the victim and a female exited the car. The 911 caller, Ms. Audrey Martin

-5-

stated that she saw the female shoot the victim in his back or in his side. T.Tr.P. 183 & 184 Lines 9-12. The autopsy results concerning the direction and path of the bullet that hit the victim is very relevant in this case, as it would have proven exactly where the gun was fired from. Petitioner assert having the opportunity to cross-examine the actual performer of the autopsy would have proven his actual innocence in this crime. Denying Petitioner the opportunity to cross-examine the person who performed this autopsy denies his right to confrontation.

Additionally, Petitioner in this case appealed these violations of confrontation to the appellate courts and was not given any relief due to the jurisprudence that governed confrontation at that time, however do to the "New Ruling" in *Melendez-Diaz v. Massachusetts*, 129 S.Ct. 2527 (2009) which now gives Petitioner his right to have this Violation of his Constitutional Rights Corrected.

### CLAIM #2

Petitioner, Patrick McClendon submits this claim based on newly discovered evidence, evidence unknown to him or the Court of Appeal, at the time of review. Under the provisions of *Article V, Section 16*, the District Court has "original jurisdiction of all criminal and civil matters." *Louisiana Code of Criminal Procedure article 924, et seq.*, implements the constitutional authority of a court to issue writs of habeas corpus in connection with an Application for Post-Conviction Relief in a criminal matter. See *State v. Terry*, No. 84-KP-0594 (La. 10/15/84), 458 So.2d 97, 100. The grounds for filing such an application are set forth in *Article 930.3(1)*. One of these grounds is that McClendons' "conviction was obtained in violation of the Constitution of the United States or the State of Louisiana."

First, Petitioner contends that his conviction *was obtained in violation of the Constitution of the United States and the State of Louisiana. La.C.Cr.P. Art. 930.8 A(1) & La.C.Cr.P.Art. 930.8 A(2),* sets forth the procedural requirements this Court

-6-

is to take into consideration when deciding whether or not to entertain a Petitioner's Application for Post-Conviction Relief. Second, Petitioner maintains that his application should be heard in the interest of justice, in light of the circumstances presented herein, i.e., "newly discovered evidence." Third, Petitioner presents the claim herein under *La.C.Cr.P. art. 930.4 A and La.C.Cr.P. art. 930.8 A(1), & A(2)*.

Petitioner's attorney filed a Motion for Discovery and asked about any rap sheets or prior criminal history for any of the state's witnesses, which the state informed him that none of their witnesses had any rap sheets nor records. This was incorrect as Roderick Earl Johnson did in fact have an open charge, which the prosecution gave him a deal to testify against Petitioner and his co-defendant. See: Exhibit "B".

Also, Petitioner suggests that this claim *is not subject to procedural bar* as the error clearly indicates manifest error and/or abuse of discretion by the Trial Judge, grossly ineffective assistance of Defense Counsel and prosector misconduct for withholding crucial Brady Material, and that petitioner is actually innocent of this crime.

Petitioner now files this claim in the interest of justice based on the standard enunciated in *State v. Cage*, 637 So.2d 89, as the evidence submitted herein was newly discovered after trial and appeal.

Petitioner's failure to discover this evidence was not due to any lack of diligence. It is material, and it is highly probable that this evidence would have produced a different verdict, had the jury been allowed to hear the evidence. Notwithstanding the probability of a different verdict, *McClendon was denied a fair trial*. The evidence of the deal with Dorothy Jo Mallard was discovered on March 25, 2009. See *Exhibit "A"* a letter from Pierce & Associates showing that the charges were not prosecuted by the district attorney's office in exchange for her testimony

-7-

against petitioner, and arrest register showing that Dorothy Jo Mallard  was arrested on these charges, and *Exhibit "B"* another letter from Pierce & Associates that show that Roderick Earl Johnson was given probation for his crimes to change his initial statement for a prosecution favorable testimony in order to obtain a conviction. See: *Exhibit "C"* the initial statement from Roderick Earl Johnson and his trial testimony Pages 130-135, which was withheld from the Petitioner and his defense counsel. All of this information was obtained from Pierce and Associates. The original statement is in total conflict with his trial testimony and will be proven in this claim. Again, this shows that Dorothy Jo Mallard and Roderick Earl Johnson had every thing to gain from giving false and perjured testimony. She was identified as the shooter by an eye witnesses, both Audrey Martin and Roderick Johnson. The prosecution was very selective and careful in questioning Dorothy Jo Mallard and Roderick Earl Johnson as to not let the truth out about her role in this crime, and about what he actually saw in order to seek convictions of both petitioner and his codefendant.

In Roderick Earl Johnson's initial taped statement to police he stated that "they must have shot him in the car because he jumped out and the woman got out of the car and shot him." "You saw the woman shoot him?" "I saw the woman, I saw the back." he also stated that the car was burgundy with tinted windows and the drivers window was up so he would have been unable to see who was driving the car. He additionally stated that he only heard "one shot". He stated that when he (the victim) had got out of the car and that woman got out of the car and shot him." He stated that the driver of the car was light or red skinned black male but during his trial testimony he changed this to state that he could not identify anyone in the car. He did this for the prosecution in order to put Petitioner as a possible shooter. He also stated that he only saw two people in the car. The police attempted to lead him in questioning to say that there might have been three, but in his statement he stated that there was two other people

besides the victim. A close review of the record is indicative of the prosecution suppressing some evidence, and manufacturing and/or manipulating other evidence, and allowing testimony known to be false to stand uncorrected. *Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104. In the trial testimony of Roderick Earl Johnson, the prosecution knew that he was giving false testimony at trial, and they allowed this false testimony to go uncorrected.

In Roderick Earl Johnson's trial testimony he stated on T.Tr.P. 132 lines 12-14 he stated that he saw the victim hop out of the car, he saw a young lady step out of the passenger side of the car and he heard another bang and saw the victim fall. Then on T.Tr.P. 133 Lines 22-27, he stated that he was unable to identify any other people in the car and went on further to state that he couldn't tell if it were a man or woman driving the vehicle. On T.Tr.P. 134 Lines 24-30, he stated that the only thing he could remember about the woman was that her head was red, unless she had on a scarf. This point was never mentioned in his initial statement to police. He claimed that she had red hair but in his initial statement he stated that she had black hair, he also stated that he saw her shoot the victim. The prosecution had him tailor his trial testimony in order to make the jury believe that Petitioner and his co-defendant had shot him and did not want the jury looking at their star witness as the actual shooter.

## *ACTUAL INNOCENCE*

In *Ward v. Cain*, 53 F.3d 106, 108 (5th Cir. 1995) and see also *Corwin v. Johnson*, 150 F.3d 473 (5th Cir. 1998) "where the petitioner shows as a actual matter, that he did not commit the crime of conviction."

To establish the requisite probability that he was actually innocent, the petitioner must support his allegations with new, reliable evidence that was not presented at trial and must show that is was "more likely than not that no reasonable juror would have convicted him in the light of the new evidence, *Schlup v. Delo*, 513 U.S. 298, 327, 130

L.Ed.2d 808, 115 S.Ct. 851 (1995). In *Schlup* the Honorable Supreme Court states that, "examples of new reliable evidence that may establish factual innocence include exculpatory scientific evidence, credible declarations of guilt by another, <u>trustworthy eyewitness accounts</u>, and certain physical evidence."

Unlike the well-known and understood burden of proving guilt beyond a reasonable doubt applicable to all criminal convictions, the concept of proving "factual innocence" is novel and indeed unprecedented in the context of criminal convictions, and even civil proceedings, under Louisiana law. The statute defines the term, as noted above, yet that definition is less than instructive on the type or amount of proof necessary, however, as noted above, the statute also liberally allows for the admission of evidence otherwise inadmissible in the criminal proceeding, suggesting a legislative intent that little limitation be placed on the introduction of evidence related in any way to the conviction and the proof of actual innocence.

To successfully plead actual innocence, a petitioner must show that his conviction resulted from "a constitutional violation." *Schlup v. Delo*, 513 U.S. 298, 327, 130 L.Ed.2d 808, 115 S.Ct. 851 (1995). To do so, he must demonstrate "that more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." In this trial the petitioner was convicted on circumstantial evidence and he is actually innocence, not mere legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623, 118 S.Ct. 1604,1611, 140 L.Ed.2d 828 (1998).

Petitioner's failure to discover this evidence was not due to any lack of diligence. It is material, and <u>it is not only highly probable</u>, but the jury in this case would have exonerated defendant and that this evidence would have produced a different verdict, had the jury been allowed to hear all of the available facts and evidence. Notwithstanding the probability of a different verdict, *Patrick McClendon was denied a fair trial and his rights to confrontation*.

District Court could not dismiss federal habeas petition claiming factual innocence on grounds that it was time-barred; under the Antiterrorism and Effective Death Penalty Act's (AEDPA) one-year statute of limitations, without first considering whether Petitioner was reasonably diligent in pursuing his being actually innocent of this charge, and if not, whether reasonable diligence was precondition of pressing the actual innocent claim, whether Petitioner presented a credible claim of actual innocence, and if so, whether the federal constitution required an actual innocence exception to the limitations period for filing habeas petition. *Whitley v. Senkowski*, 317 F.3d 223 (2nd Cir. 2003).

Because incarceration of one that is actually innocent of the crime of which he has been convicted constitutes a grave miscarriage of justice. If a defendant can adduce new evidence in post-conviction proceedings showing that constitutional error probably resulted in the conviction of one who was actually innocent, the court may reach the merits of otherwise defaulted claims asserted in a motion to vacate sentence; in order to meet this standard, however, petitioner is required to establish, by a fair probability, that the trier of facts would have entertained a reasonable doubt of his guilt. *28 U.S.C.A. § 2255*. *United States v. Cervini*, 379 F.3d 987 (10th Cir. 2004).

Claims of actual innocence by defendant who seeks to have his conviction and sentenced reviewed it must be viewed in light of the reasonable doubt standard; there must be a showing that no reasonable juror would have found the defendant guilty, which requires a probable determination about what reasonable, properly instructed jurors would do. *28 U.S.C.A. § 2255*. *United States v. Cervini*, 379 F.3d 987 (10th Cir. 2004).

This Court **must provide a cumulative evaluation of the material evidence,** and all other newly discovered evidence, keeping in mind that petitioner must show that he was convicted on merely circumstantial evidence and with this new evidence,

the evidence that the jury was not allowed to hear created an unfair trial.

Evidence of a witness's prior arrest *and of any agreement or deal with the State* by which a witness receives *any benefit or gain* in *exchange for testimony* is admissible to establish bias, prejudice, corruption, or interest against Defendant or party to litigation. *LSA-C.E. arts. 609, 609.1.* Petitioner was deprived of his right to Confrontation when the State withheld evidence of its agreement with a testifying witness, *U.S. Const. Amend. 6.* Petitioner asserts that the Prosecution withheld evidence and mislead the Trial Court because a deal *was in fact made* with Dorothy Jo Mallard & Roderick Earl Johnson *in exchange for their testimony.* The jury should have been aware of these deals, as well as petitioner, for impeachment purposes, and for the mere fact that petitioner was entitled to the *opportunity to cross examine* any witness as to any deals made with the prosecution. Petitioner is entitled to a new trial based upon this material evidence being withheld. Petitioner is also entitled to a new trial based on the fact that the State failed to disclose and/or acknowledge prior to, during, and after trial that a deal was in fact made with Dorothy Jo Mallard and Roderick Earl Johnson. The Honorable trial court judge also played a part in the deal as in Tr.Tr.P.16 reads as follows:

> Mr. Adams: "yes, I do your Honor. Apparently as part of our cross examination of Ms. Mallard and our ability to impeach her to show that she's received a deal for her testimony, it comes to my knowledge that she was released some four days, after she was arrested on a fifty thousand dollar bond which was apparently set by this court, and I find myself in a position of having to question Mr. Edwards here and possibly the court as to what reason..."

> The Court: "you can't question me."

> Mr. Adams: "as to what reasons were given for securing a fifty thousand dollar bond in a capital case when none is provided by law. So I am going to have to ask this gentlemen what he told you to request that bond and I am going to have to ask you what he told you."

> The Court: "no, you understand you cannot ask a presiding judge questions."

> Mr. Adams: "then I have to move for a mistrial, you honor."

The Court:  **"that's your problem, it's denied,"**

Mr. Adams:  "can we perhaps have someone else hear this to make a
determination?"

The Court:  "No."

Mr. Adams:  "Do you have any other remedy that you might suggest to us?"

The Court:  "I see no problem to begin with, so there's nothing to remedy."

Mr. Adams:  "I see, all right, thank you."

It's a proven fact that the trial court played a role in whatever deal was given Dorothy Jo Mallard and Roderick Earl Johnson, and when trial counsel tried to find out about this deal he was not given the information that petitioner should have been entitled to. This establishes bias and prejudice as a matter of law. *Martinez v. Carmana*, 95 N.M. 545, 624 P.2d 54 (1981).

The intentional act of withholding material evidence of such magnitude by the State, combined with the intentionally covert and artful questioning of Dorothy Jo Mallard & Roderick Earl Johnson during testimony, and the fact that Dorothy Jo Mallard went to Peter McClendon's trailer just before the police executed a search warrant looking for the gun, and the fact that the officer who supposedly found the gun was not even subpoenaed to trial in violation of petitioner's confrontation rights. Dorothy Jo Mallard was seen by an eye witness shooting the victim, then she visits petitioner's trailer and right after, the gun that was involved in the murder is found in that same trailer. The petitioner had never been to the trailer in several days and had no way in the gun getting placed in the trailer. The prosecution needed evidence to show petitioner's involvement in the crime and also to take the blame from Dorothy Jo Mallard and what better way than to have Dorothy Jo Mallard plant the gun in the trailer and then leave and the police show up and they find the gun with no fingerprints.  She also said at first, that she never went to the trailer, then changed her story to say that she went to the trailer but never went in. Then this Honorable Court

must take into account that the prosecution never called the officer that found the gun as a witness at trial, denying petitioner his right to confront his accuser concerning the murder weapon.

Then Roderick Johnson changed his initial statement as prosecutors knew with the trial testimony of Audrey Martin, Stating that she saw Dorothy Jo Mallard shoot the victim and describe her just as Roderick Johnson did in his initial statement. Roderick Earl Johnson changed his statement at trial going from the woman had black hair, to she had red hair. He also changed about seeing the woman shooting the victim when he got out of the car just as Audrey Martin had testified to "the victim got out of the car and then a woman with red hair got out of the car and that's when he was shot but he didn't see her shoot him". He additionally changed his initial statement from there were two people in the car and the driver was a bright skinned or red skinned black male that I have seen at the cab stand, and that he could positively identify him if he had a picture or if he saw him again, to I couldn't see anyone inside the car. This was all done in an attempt by the prosecution to give Dorothy Jo Mallard's testimony credibility and to take the credibility away from the eye witness, Ms. Audrey Martin.

All of this presents the epitome of prosecutorial misconduct. Combined, the presence of prosecutorial misconduct in violation of *Brady v. Maryland* and progeny cases is untenable.

### PROSECUTORIAL MISCONDUCT
### *Law and Argument*

In the present case, Petitioner avers his conviction and sentence were obtained in violation of his 5th, 6th, and 14th Amendment Rights under the United States Constitution, Louisiana Constitution of 1974, and Louisiana Statutory Law, as a result of knowing and intentional Prosecutorial Misconduct.

When presenting a claim of prosecutorial misconduct, a Petitioner must show that the actions of the prosecutor so infected the trial with unfairness as to make the

resulting conviction a denial of Due Process, and "the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial." *Kutzner v. Johnson*, 242 F.3d 605, 609 (5th Cir. 2001); *United States v. Bagley*, 473 U.S. 667, 676, 105 S.CT. 3375, 87 L.Ed.2d 481 (1985).

In this case, the prosecution knew that the original statement and trial testimony of Audrey Martin who testified that she did in fact see a gun in the hand of Dorothy Jo Mallard, on T.Tr.page 182, Line 15:

A. "but I did see her shoot Michael" and on lines 16-17

Q. "Did she shoot him once or twice?"

A. "The gun went off twice, I don't know if the second bullet hit. I really don't know that, but I know she shot him and he fell."

Additionally, in Dorothy Jo Mallard's initial statement to police she stated that "she got out of the car when the first shot was fired, but then she states that she got back in the car". Then when Dorothy Jo Mallard was dropped off, she said she then went to the home of Felicia Green and talked about the crime all night. Then the next day when police was trying to locate her Dorothy Jo Mallard was located in the Mall, where she had gone to get her hair done. She never tried to contact police nor did she ever try to leave the scene. She said in her own words that she got out of the car but then she admits that she got back in on her own. Then once she gets dropped off, she doesn't go to police but instead, she goes to Felicia Green's house and spends the night talking about what happened and then the next day, she goes to the Mall to get her hair done. She never tried to contact police or go to the police. This doesn't appear to be a woman who was afraid for her life. Then after her arrest for First Degree Murder and Armed Robbery, she has someone from the prosecutor's office, and sheriff's department call and get her a bond set at fifty thousand dollars, in order to do this, they would have had to inform the same trial court as to why they were asking for a bond for a person who was seen by an eye witness, shooting the victim, as nobody would

-15-

ever get a bond set for these type of charges. This in itself shows that the prosecution was trying to get a witness to help seek a conviction against petitioner, and the trial court knew and played a role in this deal. The defense and petitioner should have been privileged to this deals in order to properly cross examine Dorothy Jo Mallard, and Roderick Earl Johnson.

The Supreme Court has recognized that prosecutorial misconduct may "so infect the trial with unfairness as to make the resulting conviction a denial of Due Process." *Greer v. Miller*, 483 U.S. 756, 765, 107 S.CT. 3102, 97 L.Ed.2d 618 (1987)(quoting *Donnelly v. DeChristophoro*, 416 U.S. 637, 643, 94 S.CT. 1868, 40 L.Ed.2d 431 (1974). The appropriate standard of review is the narrow one of Due Process and not the broad exercise of supervisory power. *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.CT. 2464, 91 L.Ed.2d 144 (1986).

Petitioner maintains that this case *clearly* exhibits that the Prosecutorial Misconduct presented herein so infected the trial with unfairness that he was denied Due Process, and the Misconduct was of sufficient significance resulting in the denial of a fair trial.

1.     *The Brady Rule*:

The State's failure to disclose material favorable to a criminal defendant implicates more than the defendant's discovery rights; the prosecutor has an affirmative duty to disclose such evidence under the Fourteenth Amendment's Due Process Clause. Failure to reveal this evidence implicates the defendant's right to a fair trial. *U.S. v. Agurs*, 427 U.S. 97, 96 S.CT. 2329 (1976); *State v. Ortiz*, 567 So. 2d 81 (La.1980), *State v. Falkins*, 356 So. 2d 415 (La.1978), *certiorari. denied* 439 U.S. 865, 99 S.CT. 190 (1978).

The suppression of evidence favorable to an accused by the prosecution when requested, violates Due Process where the evidence is material either to guilt or

-16-

punishment, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 83 S.CT. 1194, 10 L.Ed.2d 215 (1963); *See also*, *State v. Knapper*, 579 So. 2d 956 (La.1991); *State v. Rosiere*, 488 So. 2d 965 (La.1986).

In *U.S. v. Bagley*, 473 U.S. 667, 676, 105 S.CT. 3375, 3380 (1985), the Court held that under *Brady*, there was no distinction between exculpatory evidence and impeachment evidence. See, *State v. Ortiz, supra*. *Bagley* abandoned the second and third distinctions of *Agurs* and established that, regardless of whether a request is made, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.*, 473 U.S., 682. A reasonable probability was defined as "a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 105 S.CT. 3375, 87 L.Ed.2d 481 (1985). See also *Knapper*, 579 So. 2d at 959; *Rosiere*, 488 So. 2d at 970-971.

The Supreme Court clarified: there are three components of a true *Brady* violation: (1) The evidence at issue must be favorable to the accused; either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State either willfully or inadvertently; and (3) prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263, 119 S.CT. 1936, 144 L.Ed.2d 286 (1999).

B. *The Three Elements of Strickler in Establishing a Brady Violation*:

(A) Beyond debate, the first such element of *Strickler v. Greene, supra*, in establishing a Brady violation – that the evidence be favorable to the accused as exculpatory or impeaching – is evident in this case, i.e., the deal made with Dorothy Jo Mallard & the deal made with Roderick Earl Johnson in exchange for their testimony. The above evidence is *favorable, exculpatory,* and *impeaching*. The defense requested this material in it's Motion for Discovery, only to be mislead by the prosecution. Disclosure of the above evidence to competent counsel would have

-17-

resulted in a markedly weaker case for the prosecution and there is more than a 'reasonable probability' that the outcome would have been different had this evidence been presented and heard by the fact finding jurors.

(B)    Regarding the second *Strickler* component in establishing a **Brady** violation, Shaw shows cause when his failure to develop facts in State-Court proceedings was due to the State's suppression of the evidence. Nowhere in the record can it be seen that the prosecution ever mentioned any **DEALS**, and Defense Counsel's actions and/or inactions exacerbated those of the prosecution. In any event, prosecutors are responsible for "any favorable evidence known to the others acting on the government's behalf in the case, including the police." When police or prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight. *Kyles v. Whitley*, 514 U.S. 419, 115 S.CT. 1555, 131 L.Ed.2d 490 (1995). Nowhere in the record is there *anything* to support that the prosecution ever mentioned that the deal existed with Dorothy Jo Mallard or Roderick Earl Johnson. (See: Exhibit"C", a copy of Roderick Earl Johnson's Original taped statement that was withheld from the defense and Petitioner.)

(C)    Coincident with the third Strickler component in establishing a **Brady** violation – that prejudice ensued – prejudice within the compass of the "***cause and prejudice***" requirement exists when suppressed evidence is "***material***" for Brady purposes. The materiality standard for *Brady* claims is met when "the favorable evidence could reasonably be taken to put the whole case in a different light as to undermine the confidence of the outcome." *Kyles*, at 435. To be sure, this evidence would have put the whole case in a different light. This evidence was *pertinent, advantageous*, and *exculpatory* to the defense. In verity, had the fact finding jurors been presented with evidence of extreme leniency, and the fact that all those charges were dropped and testimony known to be false were corrected, there is more than a reasonable

-18-

probability that this would have altered the outcome of the proceedings.

Petitioner asserts the State knew of, but kept back, the deals made with Dorothy Jo Mallard & Roderick Earl Johnson.  It was incumbent on the prosecution to disclose *Brady* material and McClendon cannot be faulted for relying on that.  See *Strickler*, 527 U.S., at 283-284, 119 S.CT. 1936.

This Court must provide a cumulative evaluation of the suppressed evidence, keeping in mind that McClendon does not have to show that, with the addition of the suppressed evidence, his trial would have resulted in acquittal or that there would be insufficient evidence to support a conviction. McClendon need only show that "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable." *Kyles*, 115 S.CT. at 1569.

In support, McClendon cites *State v. Bailey*, 367 So.2d 368 (La. 1979), wherein, the State failed to disclose impeachment evidence against the State's only witness concerning any deals he may have made with the State concerning his arrest on a other charges  before trial. The State also failed to tell him that it had arranged for the release of the witness *without bail* pending the trial, and then did not seek to have the witness jailed until some days after trial when some other party complained to a magistrate. The defendant was convicted, and when he learned of these facts, he filed a motion for new trial contending that his *Brady* rights had been violated. The trial court denied the motion, and the defendant appealed. On appeal, the Court reversed the defendant's conviction and sentence, granting him a new trial.

Similarly here, the state's star witness and the only witness to put the gun in petitioner's hand,  had her bond set at $50,000.00 and she had no constitutional right to even have a bond. The Court cited *Brady v. Maryland*, 373 U.S. 83, 83 S.CT. 1194, 10 L.Ed.2d 215 (1963) for the general rule that the State's failure to disclose material evidence which is favorable to the defense justifies the granting of a new trial. In

addition, Roderick Earl Johnson was given a deal to change his original statement in

order for the prosecution to obtain a conviction against Petitioner. The Court also cited

*Giglio v. United States*, 405 U.S. 150, 92 S.CT. 763, 31 L.Ed.2d 104 (1972), which

extended *Brady* to evidence that would damage the credibility of the State's witnesses.

Quoting from *Giglio*, the Court noted:

> When the "reliability of a given witness may well be determinative of
> guilt or innocence," nondisclosure of evidence affecting credibility falls
> within this general rule. . . Moreover, whether the nondisclosure was a
> result of negligence or design, it is the responsibility of the prosecutor.

*Bailey*, at 370. The Court then quoted from *United States v. Agurs*, 427
U.S. 97, 96 S.CT. 2392, 49 L.Ed.2d 342 (1976):

> "The proper standard of materiality must reflect our overriding concern
> with the justice of the finding of guilt. Such a finding is permissible only
> if supported by evidence establishing guilt beyond a reasonable doubt.
> It necessarily follows that if the omitted evidence creates a reasonable
> doubt that did not otherwise exist, constitutional error has been
> committed. This means that the omission must be evaluated in the context
> of the entire record. If there is no reasonable doubt about guilt whether
> or not the additional evidence is considered, there is no justification for
> a new trial. On the other hand, if the verdict is already of questionable
> validity, additional evidence of relatively minor importance must be
> sufficient to create a reasonable doubt."

*Bailey*, at 370-371. The Court found that the defendant "could very
probably have negated, to a considerable extent, the credibility of this
important state witness" which would have created a reasonable doubt if
he had been aware of the evidence which the State withheld from the
Court.

In addition to the promise of extreme leniency, the prosecution gave Dorothy

Jo Mallard a deal in the form of the charges of First Degree Murder and Armed

Robbery were at first, reduced to Principal to First Degree Murder and Principal to

Armed Robbery and then dropped. Roderick Earl Johnson had received probation

after changing his original statement to police. Roderick Earl Johnson's trial testimony

was totally unreliable and false. Detectives and prosecutor's knew that their testimony

and statements were totally unreliable, yet the prosecution chose to allow them to

testify in total conflict with the original statements in order to obtain the conviction.

A close review of the record is indicative of the prosecution suppressing some evidence, and manufacturing and/or manipulating other evidence, and allowing testimony known to be false to stand uncorrected. This is a violation of McClendons' *5th, 6th, 8th, and 14th* Amendment rights under the United States Constitution and *Article I, Sections 2, 13, 14 and 16*, of the Louisiana Constitution.

As a result of the State's failure to disclose, McClendon was denied his right to present a defense, right to *adequate* cross-examination, right to *full* confrontation and a fair trial having a just and reliable outcome. The State knew of, but kept back, that it was in collusion with Dorothy Jo Mallard and Roderick Earl Johnson. McClendon trusted the prosecution would not engage in improper litigation conduct to obtain a conviction.

The Court observed in *Strickler*, defense counsel has no "procedural obligation to assert constitutional error on the basis of mere suspicion that some prosecutorial misstep may have occurred." 527 U.S., at 286-87, 119 S.CT. 1936. "Ordinarily, we presume that public officials have properly discharged their official duties." *Bracy v. Gramley*, 520 U.S. 899, 909, 117 S.CT. 1793 (1997) (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15, 47 S.CT. 1 (1926) (internal quotation marks omitted).

The Court has several times underscored the "special role played by the American prosecutor in the search for truth in criminal trials." *Strickler*, 527 U.S. at 281, 119 S.CT. 1936; *Kyles*, 514 U.S. at 439-440, 115 S.Ct. 1555; *United States v. Bagley*, 473 U.S. 667, 675, n.6, 105 S.Ct. 3375 (1985); *Berger*, 295 U.S., at 88, 55 S.Ct. 629. See also: *Olmstead v. United States*, 277 U.S. 438, 484, 48 S.Ct. 564 (1928) (Brandeis, J. Dissenting). Courts, litigants, and juries properly anticipate that "obligations [to refrain from improper methods to secure a conviction] . . . plainly resid[ing] upon the prosecuting attorney, will be faithfully observed." *Berger*, 295 U.S.,

at 88, 55 S.CT. 629. A Prosecutor's dishonest and unwarranted concealment should attract no judicial approbation. *Kyles*, 514 U.S., at 440, 115 S.CT. 1555 ("The prudence of the careful prosecutor should not . . . be discouraged.").

The existence of prejudice in this case is marked. It is untenable that one could conclude that Patrick McClendon received a *fair trial*, given the jury's ignorance of the fact that the State was in collusion with Dorothy Jo Mallard and Roderick Earl Johnson concerning the deals made with both of the state's witnesses, and withheld the same. It cannot be said with any noticeable amount of confidence that had the jury known these facts, the verdict would have been the same. Of course, we will never know because the State cheated. Without these facts, the truth will never be manifest.

## CONCLUSION

WHEREFORE, petitioner contends that he has shown that the prosecution has violated discovery and this violation if of constitutional dimensions. His Constitutional Right to Confrontation was denied by the trial Court denying his objections to the trial testimony of Dr. Casama. This testimony should be stricken as inadmissible. His right to a fair and partial trial has also been taken away by this misconduct by the district attorney's office, by discovery violations. The district attorney's office should have turned over all exculpatory material in petitioner's criminal trial, especially deals made with witnesses, the fact that the prosecution solicited false testimony from Dorothy Jo Mallard, and Roderick Earl Johnson in order to obtain a conviction they allowed the trial testimony to go uncorrected. Then Petitioner has shown that the 22nd Judicial District Court has refused to even allow the District Attorney's Office the opportunity to answer the allegations, thereby denying Petitioner his constitutional right to access to the Courts.

## PRAYER FOR RELIEF

Mr. Patrick McClendon prays that this Honorable Court grants his Application

for Supervisory Writs, grants him a new trial, with proper discovery and grants relief

that he has available to him due to the errors presented herein and any other such relief

this Honorable Court deems appropriate.

Respectfully submitted this 4th day of June, 2010.

Patrick McClendon #106727
Camp "C" Bear-2
Louisiana State Penitentiary
Angola, LA 70712

## AFFIDAVIT / CERTIFICATE OF SERVICE

I, Patrick McClendon, hereby swear and aver that the foregoing is true and

correct to the best of my knowledge and belief. I, Patrick McClendon, hereby further

swear and aver that a copy of the foregoing has been served upon counsel for the

Respondent, Walter Reed, D.A., Parish of Washington, by placing a copy of same in

the U.S. Mail, properly addressed and postage pre-paid.

Done this 4th day of June, 2010.

Patrick McClendon #106727

# STATE OF LOUISIANA
# COURT OF APPEAL, FIRST CIRCUIT

STATE OF LOUISIANA                    NUMBER 2010 KW 1042

VERSUS

PATRICK McCLENDON                     SEP 0 2 2010

---

In Re:     Patrick McClendon, applying for supervisory
           writs, 22nd Judicial District Court, Parish of
           Washington, No. 93-CR1-54452.

---

BEFORE:  WHIPPLE, McDONALD AND McCLENDON, JJ.

        WRIT DENIED.

                          PMc
                          VGW
                          JMM

COURT OF APPEAL, FIRST CIRCUIT

*Elizabeth D. Nanita*
DEPUTY CLERK OF COURT
FOR THE COURT

IN THE
LOUISIANA SUPREME COURT
STATE OF LOUISIANA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

NUMBER _____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PATRICK MCCLENDON
Petitioner

VS.

N. BURL CAIN, WARDEN,
Louisiana State Penitentiary
Respondent

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
APPLICATION FOR SUPERVISORY WRIT FROM THE DENIAL OF
SUPERVISORY WRIT IN THE FIRST CIRCUIT
COURT OF APPEAL DOCKET NUMBER 2010-KW-1042 FROM THE DENIAL
OF PETITIONER'S APPLICATION FOR POST CONVICTION RELIEF,
CRIMINAL NO. 93-CR1-54452, FROM THE
22ND JUDICIAL DISTRICT COURT, PARISH OF WASHINGTON,
JUDGE ALLISON H. PENZATO
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

APPLICATION FOR SUPERVISORY WRIT
OF REVIEW

ON BEHALF OF PATRICK MCCLENDON
PRO SE PETITIONER

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORIGINAL BRIEF ON THE MERITS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Patrick McClendon*

RESPECTFULLY SUBMITTED BY
PATRICK MCCLENDON #106727
CAMP "C" BEAR 2
LOUISIANA STATE PENITENTIARY
ANGOLA, LA 70712

CRIMINAL PROCEEDING

1

## STATEMENT OF JURISDICTION

The Louisiana Supreme Court has supervisory jurisdiction over this criminal proceedings from denial from the First Circuit Court of Appeal of the denial of the District Court on Post-Conviction, pursuant to *Article 5, § 10* of the Louisiana Constitution of 1974, as amended. *LSA-Const. Art. 5, Sec. 10* (1996).

## STATEMENT OF THE CASE

Petitioner and codefendant, Anthony M. Bell were charged by grand jury indictment with first degree murder, in violation of *La. R.S. 14:30*. They pled not guilty and after trial by jury, were found guilty of the responsive offense of second degree murder, a violation of *La.R.S. 14:30.1* both men received the mandatory sentence of life without benefit of parole, probation, or suspension of sentence, with credit for time served. in docket no. 93-CR1-54452, Division "E" of the Twenty Second Judicial District Court. Petitioner then appealed to the First Circuit Court of Appeal in docket no. 96-KA-0581 and was denied on December 20, 1996. *State of Louisiana v. Patrick McClendon*, 686 So.2d 177. Petitioner then sought writs in the Louisiana Supreme Court and was denied on June 20, 1997 in *State of Louisiana v. Patrick Cassius McClendon*, 695 So.2d 1352. Petitioner then executed a Motion for Contradictory Hearing under *LSA C.Cr.P. art. 822* wherein he sought to be provided with a copy of the prosecutor's file. A hearing on that Motion went forward on November 12, 1999, following which the trial court ordered the prosecutor to provide Petitioner with a copy of original and supplemental police reports and the statements of witnesses who testified at trial and that the Clerk of Court to provide Petitioner with a copy of his sentencing transcript and any motions filed on his behalf. The Clerk complied with the trial court's order as evidenced by his transmittal letter of November 24, 1999. On May 31, 2000 Petitioner then filed an application for post-conviction relief. The

2

application was denied on July 10, 2000. Petitioner then sought writs to the First Circuit Court of Appeal and the Louisiana Supreme Court which was denied in *State ex rel. McClendon v. State*, 811 So.2d 902 (La. 2002). Petitioner then filed for a Petition for Habeas Corpus on March 25, 2003 which was dismissed with prejudice on January 9, 2004. Petitioner now raises a Sixth Amendment Violation from the recently  decided case of *Melendez-Diaz v. Massachusetts*, 129 S.Ct. 2527 (2009) and from new information from Pierce & Associates concerning State's  key witness Dorothy Jo Mallard, and the initial Taped Statement from Roderick Johnson, two of the state's  witnesses and then timely filed his second application for Post-Conviction relief under *La.C.Cr.P.art 930.8 A(2) & La.C.Cr.P.art. 930.8 A(1)* on February 26, 2010, based upon a new ruling of law and newly discovered evidence that was withheld from Petitioner and his defense attorney. The District Court submitted an order Dismissing Petitioner's petition for Post-Conviction Relief without a proper ruling under La.C.Cr.P.Art. 929 on May 17, 2010. Petitioner then timely filed application for Supervisory Writs on June 4, 2010, which was denied by the First Circuit Court of Appeal on September 2, 2010 in Docket Number 2010-KW-1042. Petitioner now timely files his Supervisory Writ of Reveiw on September 21, 2010.

## STATEMENT OF THE FACTS

On the day in question it was stated that Patrick McClendon drove his car from Columbia, Mississippi with co-defendant Nevil Watts and Dorothy Mallard as passengers. Once in Bogalusa, Louisiana, Michael Myers was spotted by Dorothy Mallard. Afterwards, Myers got into the car with the suspects.

Meyers was shot and killed. Mallard testified that the shots were fired by McClendon, with a small weapon, and Watts, with a larger one. However, the witnesses from the neighborhood did not see either of the alleged perpetrators

3

inside the car. More significantly, one witness by the name of Audrey Martin testified that Mallard jumped from the car right behind the victim and shot the victim. Police located the vehicle in Columbia, Mississippi. The next day, near the house where petitioner was residing with his pregnant girlfriend. Monica Page, the girlfriend said that petitioner did not leave the house between his arrival the night before and when he was arrested. A few days later, on December 17, 1992, the police searched the trailer where petitioner lived with his brother and uncle. Peter McClendon, who lived in the house next to the trailer and Mary McClendon, Mother of petitioner, who lived in the house next to the trailer, both of whom saw Mallard go to the trailer before police went and searched the trailer. The police during the search, found a small caliber weapon in the trailer that Dorothy Mallard could have planted there. However, testing revealed that it was the same weapon used to shoot the victim.

The only witness who testified petitioner fired the alleged shots which killed Michael Meyers was Dorothy Mallard. All other crime witnesses reported the shots were fired by a black female. More significantly, eyewitness Audrey Martin, testified that Dorothy Mallard was the black female suspect that shot the victim in question. In the initial taped statement from Roderick Johnson, he stated that the black female shot the victim, however, at trial he changed his initial statement as a prosecution witness against Petitioner.

## CLAIMS FOR RELIEF

1. **Petitioner's Conviction Violated the United States Constitutional Confrontation Clause in allowing the Coroner to Testify over Defense Counsel's Objection, Denying Petitioner his Right to Confrontation.**

2. **Petitioner's Conviction Violated the United States Constitution, the Louisiana Constitution of 1974 and Clearly Established Federal and State Jurisprudence When the Prosecution Withheld Evidence of the Deal of Leniency/Immunity Made with Witness Dorothy Jo Mallard for Her Testimony Against Petitioner, and for the Prosecution Withholding Evidence**

4

of the Deal of Leniency/immunity Made with Witness Roderick Earl Johnson's for His Trial Testimony, in Violation of Petitioner's Rights to Due Process of Law, Fair Trial, Confrontation and Right to Cross-examination, and Which Would Prove Petitioner Actually Innocent

### CLAIM #1

Petitioner, Patrick McClendon submits this claim based upon a new ruling of law governing Confrontation based upon the New ruling in *Melendez-Diaz v. Massachusetts*, 129 S.Ct. 2527 (2009) where the United Supreme Court held that

*(1) analysts certificates of analysis were affidavits within core class of testimonial statements covered by Confrontation Clause;*

*(2) analysts were not removed from coverage of Confrontation Clause on theory that they were not "accusatory" witnesses;*

*(3) analysts were not removed from coverage of Confrontation Clause on theory that they were not conventional witnesses;*

*(4) analysts were not removed from coverage of Confrontation Clause on theory that their testimony consisted of neutral, scientific testing;*

*(5) certificates of analysis were not removed from coverage of Confrontation Clause on theory that they were akin to official and business records; and*

*(6) defendant's ability to subpoena analysts did not obviate state's obligation to produce analysts for cross-examination.*

In the case at hand Petitioner's counsel objected at trial during cross-examination of Dr. Roger Casama the coroner of Washington Parish who testified at trial that he is an expert in the field of forensic medicine. T.Tr.P. 18, Lines 25,25..

On T.Tr.P. 20, Lines 28-32, defense counsel objected to this doctor making conclusions concerning the autopsy when he in fact was not the doctor who performed the autopsy. All Dr. Roger Casama did was pronounce the victim dead.

5

T.Tr.P. 21. Lines 8-15, the defense again objected on another ground, that they were being denied the right to confront the person who performed the autopsy. Then, when questioned about the immediate cause of death, the defense counsel again objected as Dr. Casama was testifying about what another doctor saw, T.Tr.P. 21, Lines 29-32.

On T.Tr.P. 23, Lines 14-21, the defense objected to the fact that Dr. Casama made a recitation and testified as to a report that he did not do, therefore denying the defense the opportunity to confront a crucial witness.

In *Melendez-Diaz v. Massachusetts*, 129 S.Ct. 2527 (2009), the objections feel within the core class of testimonial statements governed by the confrontation clause.

Similarly here, Petitioner's counsel objected to all the trial testimony of Dr. Casama for being second hand information and denying the defense of the opportunity to confront a crucial witness.

Under *Crawford*, a witness's testimony against a defendant is inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination. 541 U.S. at 54, 124 S.Ct. 1354.

The testimony in the instant case was from a report done by a person different than the person testifying. Dr. Casama was merely testifying to what someone else discovered and could in no way satisfy the Sixth Amendment Confrontation Rights afforded to the Petitioner.

The Sixth Amendment to the United States Constitution, made applicable to the States via the Fourteenth Amendment, *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), provides that "[i]n all criminal prosecutions, the accused shall enjoy the right... to be confronted with the witnesses against him." in *Crawford*, after reviewing the Clause's historical underpinnings, we held that it

6

guarantees a defendant's right to confront those "who bear testimony" against him. 541 U.S. at 51, 124 S.Ct. 1354. A witness's testimony against a defendant is thus inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination. Id,. At 54, 124 S.Ct. 1354.

Simply put, in a case such as this, where two witnesses right after the shooting, state that they saw the victim get out of the car, and then saw a female exit the car and shoot the victim. The prosecution's theory was that the shot came from within the car and after getting Roderick Johnson to change his initial statement.(See: Exhibit "C" where he stated that he saw the woman shoot the victim) to say that he heard a shot fired after the victim and a female exited the car. The 911 caller, Ms. Audrey Martin stated that she saw the female shoot the victim in his back or in his side. T.Tr.P. 183 & 184 Lines 9-12. The autopsy results concerning the direction and path of the bullet that hit the victim is very relevant in this case, as it would have proven exactly where the gun was fired from. Petitioner assert having the opportunity to cross-examine the actual performer of the autopsy would have proven his actual innocence in this crime. Denying Petitioner the opportunity to cross-examine the person who performed this autopsy denies his right to confrontation.

Additionally, Petitioner in this case appealed these violations of confrontation to the appellate courts and was not given any relief due to the jurisprudence that governed confrontation at that time, however do to the "New Ruling" in *Melendez-Diaz v. Massachusetts*, 129 S.Ct. 2527 (2009) which now gives Petitioner his right to have this Violation of his Constitutional Rights Corrected.

## CLAIM #2

7

Petitioner, Patrick McClendon submits this claim based on newly discovered evidence, evidence unknown to him or the Court of Appeal, at the time of review. First this claim is predicated under two Louisiana Supreme Court cases, *State v. Orman*, 925 So.2d 761 (2nd Cir. 3/16/06) and *Carlin v. Cain*, 706 So.2d 968(La. 1998), which states the exception to *La.C.Cr.P. art. 930.8(A)(1)*.

The fact alone that the district Court failed to even give the Petitioner an opportunity to expand the record with an evidentiary hearing in this case warrants reversal. Petitioner has shown that this material was not known to him or his counsel before trial or appeal. It should also be noted that the prosecution has never even rebutted this Brady Material nor opposed Petitioner's application for Post-Conviction Relief under this "Newly Discovered Evidence" and under a "New Ruling of Law".   Under the provisions of *Article V, Section 16*, the District Court has "original jurisdiction of all criminal and civil matters." *Louisiana Code of Criminal Procedure article 924, et seq.*, implements the constitutional authority of a court to issue writs of habeas corpus in connection with an Application for Post-Conviction Relief in a criminal matter.  See *State v. Terry*, No. 84-KP-0594 (La. 10/15/84), 458 So.2d 97, 100.  The grounds for filing such an application are set forth in *Article 930.3(1)*.  One of these grounds is that McClendons' "conviction was obtained in violation of the Constitution of the United States or the State of Louisiana."

Petitioner also contends that his conviction *was obtained in violation of the Constitution of the United States and the State of Louisiana*.  *La.C.Cr.P. Art. 930.8 A(1) & La.C.Cr.P.Art. 930.8 A(2)*, sets forth the procedural requirements this Court is to take into consideration when deciding whether or not to entertain a Petitioner's Application for Post-Conviction Relief. Second, Petitioner maintains that his application should be heard in the interest of justice, in light of the

8

circumstances presented herein, i.e., "newly discovered evidence." Third, Petitioner presents the claim herein under *La.C.Cr.P. art. 930.4 A and La.C.Cr.P. art. 930.8 A(1), & A(2)*.

Petitioner's attorney filed a Motion for Discovery and asked about any rap sheets or prior criminal history for any of the state's witnesses, which the state informed him that none of their witnesses had any rap sheets nor records. This was incorrect as Roderick Earl Johnson did in fact have an open charge, which the prosecution gave him a deal to testify against Petitioner and his co-defendant. See: Exhibit "B".

Also, Petitioner suggests that this claim *is not subject to procedural bar* as the error clearly indicates manifest error and/or abuse of discretion by the Trial Judge, grossly ineffective assistance of Defense Counsel and prosector misconduct for withholding crucial Brady Material, and that petitioner is actually innocent of this crime.

Petitioner now files this claim in the interest of justice based on the standard enunciated in *State v. Cage*, 637 So.2d 89, as the evidence submitted herein was newly discovered after trial and appeal.

Petitioner's  failure to discover this evidence was not due to any lack of diligence. It is material, and it is highly probable that this evidence would have produced a different verdict, had the jury been allowed to hear the evidence. Notwithstanding the probability of a different verdict, *McClendon  was denied a fair trial*. The evidence of the deal with Dorothy Jo Mallard  was discovered on March 25, 2009.  See *Exhibit "A"* a letter from Pierce & Associates showing that the charges were not prosecuted by the district attorney's office in exchange for her testimony against petitioner, and arrest register showing that Dorothy Jo Mallard was arrested on these charges, and *Exhibit "B"* another letter from Pierce &

9

Associates that show that Roderick Earl Johnson was given probation for his crimes to change his initial statement for a prosecution favorable testimony in order to obtain a conviction. See: *Exhibit "C"* the initial statement from Roderick Earl Johnson and his trial testimony Pages 130-135, which was withheld from the Petitioner and his defense counsel. All of this information was obtained from Pierce and Associates. The original statement is in total conflict with his trial testimony and will be proven in this claim. Again, this shows that Dorothy Jo Mallard and Roderick Earl Johnson had every thing to gain from giving false and perjured testimony. She was identified as the shooter by an eye witnesses, both Audrey Martin and Roderick Johnson. The prosecution was very selective and careful in questioning Dorothy Jo Mallard and Roderick Earl Johnson as to not let the truth out about her role in this crime, and about what he actually saw in order to seek convictions of both petitioner and his codefendant.

In Roderick Earl Johnson's initial taped statement to police he stated that "they must have shot him in the car because he jumped out and the woman got out of the car and shot him." "You saw the woman shoot him?" "I saw the woman, I saw the back." he also stated that the car was burgundy with tinted windows and the drivers window was up so he would have been unable to see who was driving the car. He additionally stated that he only heard "one shot". He stated that when he (the victim) had got out of the car and that woman got out of the car and shot him." He stated that the driver of the car was light or red skinned black male but during his trial testimony he changed this to state that he could not identify anyone in the car. He did this for the prosecution in order to put Petitioner as a possible shooter. He also stated that he only saw two people in the car. The police attempted to lead him in questioning to say that there might have been three, but in his statement he stated that there was two other people besides the victim. A close

10

review of the record is indicative of the prosecution suppressing some evidence, and manufacturing and/or manipulating other evidence, and allowing testimony known to be false to stand uncorrected. *Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104. In the trial testimony of Roderick Earl Johnson, the prosecution knew that he was giving false testimony at trial, and they allowed this false testimony to go uncorrected.

In Roderick Earl Johnson's trial testimony he stated on T.Tr.P. 132 lines 12-14 he stated that he saw the victim hop out of the car, he saw a young lady step out of the passenger side of the car and he heard another bang and saw the victim fall. Then on T.Tr.P. 133 Lines 22-27, he stated that he was unable to identify any other people in the car and went on further to state that he couldn't tell if it were a man or woman driving the vehicle. On T.Tr.P. 134 Lines 24-30, he stated that the only thing he could remember about the woman was that her head was red, unless she had on a scarf. This point was never mentioned in his initial statement to police. He claimed that she had red hair but in his initial statement he stated that she had black hair, he also stated that he saw her shoot the victim. The prosecution had him tailor his trial testimony in order to make the jury believe that Petitioner and his co-defendant had shot him and did not want the jury looking at their star witness as the actual shooter.

*ACTUAL INNOCENCE*

In *Ward v. Cain*, 53 F.3d 106, 108 (5th Cir. 1995) and see also *Corwin v. Johnson*, 150 F.3d 473 (5th Cir. 1998) "where the petitioner shows as a actual matter, that he did not commit the crime of conviction."

To establish the requisite probability that he was actually innocent, the petitioner must support his allegations with new, reliable evidence that was not presented at trial and must show that is was "more likely than not that no

reasonable juror would have convicted him in the light of the new evidence. *Schlup v. Delo*, 513 U.S. 298, 327, 130 L.Ed.2d 808, 115 S.Ct. 851 (1995). In *Schlup* the Honorable Supreme Court states that, "examples of new reliable evidence that may establish factual innocence include exculpatory scientific evidence, credible declarations of guilt by another, <u>trustworthy eyewitness accounts</u>, and certain physical evidence."

Unlike the well-known and understood burden of proving guilt beyond a reasonable doubt applicable to all criminal convictions, the concept of proving "factual innocence" is novel and indeed unprecedented in the context of criminal convictions, and even civil proceedings, under Louisiana law. The statute defines the term, as noted above, yet that definition is less than instructive on the type or amount of proof necessary, however, as noted above, the statute also liberally allows for the admission of evidence otherwise inadmissible in the criminal proceeding, suggesting a legislative intent that little limitation be placed on the introduction of evidence related in any way to the conviction and the proof of actual innocence.

To successfully plead actual innocence, a petitioner must show that his conviction resulted from "a constitutional violation." *Schlup v. Delo*, 513 U.S. 298, 327, 130 L.Ed.2d 808, 115 S.Ct. 851 (1995). To do so, he must demonstrate "that more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." In this trial the petitioner was convicted on circumstantial evidence and he is actually innocence, not mere legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623, 118 S.Ct. 1604,1611, 140 L.Ed.2d 828 (1998).

Petitioner's failure to discover this evidence was not due to any lack of diligence. It is material, and <u>it is not only highly probable</u>, but the jury in this

12

case would have exonerated defendant and that this evidence would have produced a different verdict, had the jury been allowed to hear all of the available facts and evidence.    Notwithstanding the probability of a different verdict, *Patrick McClendon  was denied a fair trial and his rights to confrontation*.

District Court could not dismiss federal habeas petition claiming factual innocence on grounds that it was time-barred; under the Antiterrorism and Effective Death Penalty Act's (AEDPA) one-year statute of limitations, without first considering whether Petitioner was reasonably diligent in pursuing his being actually innocent of this charge, and if not, whether reasonable diligence was precondition of pressing the actual innocent claim, whether Petitioner presented a credible claim of actual innocence, and if so, whether the federal constitution required an actual innocence exception to the limitations period for filing habeas petition. *Whitley v. Senkowski*, 317 F.3d 223 (2nd Cir. 2003).

Because incarceration of one that is actually innocent of the crime of which he has been convicted constitutes a grave miscarriage of justice. If a defendant can adduce new evidence in post-conviction proceedings showing that constitutional error probably resulted in the conviction of  one who was actually innocent, the court may reach the merits of otherwise defaulted claims asserted in a motion to vacate sentence; in order to meet this standard, however, petitioner is required to establish, by a fair probability, that the trier of facts would have entertained a reasonable doubt of his guilt. *28 U.S.C.A. § 2255. United States v. Cervini*, 379 F.3d 987 (10th Cir. 2004).

Claims of actual innocence by defendant who seeks to have his conviction and sentenced reviewed it  must be viewed in light of the reasonable doubt standard; there must be a showing that no reasonable juror would have found the defendant guilty, which requires a probable determination about what reasonable,

13

properly instructed jurors would do. *28 U.S.C.A. § 2255. United States v. Cervini*, 379 F.3d 987 (10th Cir. 2004).

This Court **must provide a cumulative evaluation of the material evidence, and all other newly discovered evidence,** keeping in mind that petitioner must show that he was convicted on merely circumstantial evidence and with this new evidence, the evidence that the jury was not allowed to hear created an unfair trial.

Evidence of a witness's prior arrest *and of any agreement or deal with the State* by which a witness receives *any benefit or gain* in exchange for *testimony* is admissible to establish bias, prejudice, corruption, or interest against Defendant or party to litigation. *LSA-C.E. arts. 609, 609.1*. Petitioner was deprived of his right to Confrontation when the State withheld evidence of its agreement with a testifying witness, *U.S. Const. Amend. 6*. Petitioner asserts that the Prosecution withheld evidence and mislead the Trial Court because a deal *was in fact made* with Dorothy Jo Mallard & Roderick Earl Johnson *in exchange for their testimony*. The jury should have been aware of these deals, as well as petitioner, for impeachment purposes, and for the mere fact that petitioner was entitled to the *opportunity to cross examine* any witness as to any deals made with the prosecution. Petitioner is entitled to a new trial based upon this material evidence being withheld. Petitioner is also entitled to a new trial based on the fact that the State failed to disclose and/or acknowledge prior to, during, and after trial that a deal was in fact made with Dorothy Jo Mallard and Roderick Earl Johnson. The Honorable trial court judge also played a part in the deal as in Tr.Tr.P.16  reads as follows:

Mr. Adams: "yes, I do your Honor. Apparently as part of our cross examination                          of Ms. Mallard and our ability to impeach her to show that she's                          received a deal for her testimony, it comes to my

14

knowledge that | she was released some four days, after she was
arrested on a fifty | thousand dollar bond which was apparently set by
this court, and | I find myself in a position of having to question
Mr. Edwards here | and possibly the court as to what reason..."

The Court: "you can't question me."

Mr. Adams: "as to what reasons were given for securing a fifty thousand
dollar                   bond in a capital case when none is provided by law. So I
am              going to have to ask this gentlemen what he told you to request
that             bond and I am going to have to ask you what he told you."

The Court: "no, you understand you cannot ask a presiding judge

questions."

Mr. Adams: "then I have to move for a mistrial, your honor."

The Court: <u>**"that's your problem, it's denied."**</u>

Mr. Adams: "can we perhaps have someone else hear this to make a
determination?"

The Court: "No,"

Mr. Adams: "Do you have any other remedy that you might suggest to us?"

The Court: "I see no problem to begin with, so there's nothing to remedy."

Mr. Adams: "I see, all right, thank you."

It's a proven fact that the trial court played a role in whatever deal was given

Dorothy Jo Mallard and Roderick Earl Johnson, and when trial counsel tried to

find out about this deal he was not given the information that petitioner should

have been entitled to. This establishes bias and prejudice as a matter of law.

*Martinez v. Carmona*, 95 N.M. 545, 624 P.2d 54 (1981).

The intentional act of withholding material evidence of such magnitude by

the State, combined with the intentionally covert and artful questioning of Dorothy

Jo Mallard & Roderick Earl Johnson during testimony, and the fact that Dorothy Jo

Mallard went to Peter McClendon's trailer just before the police executed a search

warrant looking for the gun, and the fact that the officer who supposedly found the

15

gun was not even subpoenaed to trial in violation of petitioner's confrontation rights. Dorothy Jo Mallard was seen by an eye witness shooting the victim, then she visits petitioner's trailer and right after, the gun that was involved in the murder is found in that same trailer. The petitioner had never been to the trailer in several days and had no way in the gun getting placed in the trailer. The prosecution needed evidence to show petitioner's involvement in the crime and also to take the blame from Dorothy Jo Mallard and what better way than to have Dorothy Jo Mallard plant the gun in the trailer and then leave and the police show up and they find the gun with no fingerprints. She also said at first, that she never went to the trailer, then changed her story to say that she went to the trailer but never went in. Then this Honorable Court must take into account that the prosecution never called the officer that found the gun as a witness at trial, denying petitioner his right to confront his accuser concerning the murder weapon.

Then Roderick Johnson changed his initial statement as prosecutors knew with the trial testimony of Audrey Martin, Stating that she saw Dorothy Jo Mallard shoot the victim and describe her just as Roderick Johnson did in his initial statement. Roderick Earl Johnson changed his statement at trial going from the woman had black hair, to she had red hair. He also changed about seeing the woman shooting the victim when he got out of the car just as Audrey Martin had testified to "the victim got out of the car and then a woman with red hair got out of the car and that's when he was shot but he didn't see her shoot him". He additionally changed his initial statement from there were two people in the car and the driver was a bright skinned or red skinned black male that I have seen at the cab stand, and that he could positively identify him if he had a picture or if he saw him again, to I couldn't see anyone inside the car. This was all done in an attempt by the prosecution to give Dorothy Jo Mallard's testimony credibility and to take

the credibility away from the eye witness, Ms. Audrey Martin.

All of this presents the epitome of prosecutorial misconduct. Combined, the presence of prosecutorial misconduct in violation of *Brady v. Maryland* and progeny cases is untenable.

## PROSECUTORIAL MISCONDUCT
### *Law and Argument*

In the present case, Petitioner avers his conviction and sentence were obtained in violation of his 5th, 6th, and 14th Amendment Rights under the United States Constitution, Louisiana Constitution of 1974, and Louisiana Statutory Law, as a result of knowing and intentional Prosecutorial Misconduct.

When presenting a claim of prosecutorial misconduct, a Petitioner must show that the actions of the prosecutor so infected the trial with unfairness as to make the resulting conviction a denial of Due Process, and "the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial." *Kutzner v. Johnson*, 242 F.3d 605, 609 (5th Cir. 2001); *United States v. Bagley*, 473 U.S. 667, 676, 105 S.CT. 3375, 87 L.Ed.2d 481 (1985).

In this case, the prosecution knew that the original statement and trial testimony of Audrey Martin who testified that she did in fact see a gun in the hand of Dorothy Jo Mallard, on T.Tr.page 182, Line 15:

A. "but I did see her shoot Michael" and on lines 16-17

Q. "Did she shoot him once or twice?"

A. "The gun went off twice, I don't know if the second bullet hit. I really don't know that, but I know she shot him and he fell."

Additionally, in Dorothy Jo Mallard's initial statement to police she stated that "she got out of the car when the first shot was fired, but then she states that she got back in the car". Then when Dorothy Jo Mallard was dropped off, she said she

17

then went to the home of Felicia Green and talked about the crime all night. Then the next day when police was trying to locate her Dorothy Jo Mallard was located in the Mall, where she had gone to get her hair done. She never tried to contact police nor did she ever try to leave the scene. She said in her own words that she got out of the car but then she admits that she got back in on her own. Then once she gets dropped off, she doesn't go to police but instead, she goes to Felicia Green's house and spends the night talking about what happened and then the next day, she goes to the Mall to get her hair done. She never tried to contact police or go to the police. This doesn't appear to be a woman who was afraid for her life. Then after her arrest for First Degree Murder and Armed Robbery, she has someone from the prosecutor's office, and sheriff's department call and get her a bond set at fifty thousand dollars, in order to do this, they would have had to inform the same trial court as to why they were asking for a bond for a person who was seen by an eye witness, shooting the victim, as nobody would ever get a bond set for these type of charges. This in itself shows that the prosecution was trying to get a witness to help seek a conviction against petitioner, and the trial court knew and played a role in this deal. The defense and petitioner should have been privileged to this deals in order to properly cross examine Dorothy Jo Mallard, and Roderick Earl Johnson.

The Supreme Court has recognized that prosecutorial misconduct may "so infect the trial with unfairness as to make the resulting conviction a denial of Due Process." *Greer v. Miller*, 483 U.S. 756, 765, 107 S.CT. 3102, 97 L.Ed.2d 618 (1987)(quoting *Donnelly v. DeChristophoro*, 416 U.S. 637, 643, 94 S.CT. 1868, 40 L.Ed.2d 431 (1974). The appropriate standard of review is the narrow one of Due Process and not the broad exercise of supervisory power. *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.CT. 2464, 91 L.Ed.2d 144 (1986).

Petitioner maintains that this case *clearly* exhibits that the Prosecutorial Misconduct presented herein so infected the trial with unfairness that he was denied Due Process, and the Misconduct was of sufficient significance resulting in the denial of a fair trial.

I.   *The Brady Rule*:

The State's failure to disclose material favorable to a criminal defendant implicates more than the defendant's discovery rights; the prosecutor has an affirmative duty to disclose such evidence under the Fourteenth Amendment's Due Process Clause. Failure to reveal this evidence implicates the defendant's right to a fair trial. *U.S. v. Agurs*, 427 U.S. 97, 96 S.CT. 2329 (1976); *State v. Ortiz*, 567 So. 2d 81 (La.1980); *State v. Falkins*, 356 So. 2d 415 (La.1978), *certiorari denied* 439 U.S. 865, 99 S.CT. 190 (1978).

The suppression of evidence favorable to an accused by the prosecution when requested, violates Due Process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 83 S.CT. 1194, 10 L.Ed.2d 215 (1963); *See also, State v. Knapper*, 579 So. 2d 956 (La.1991); *State v. Rosiere*, 488 So. 2d 965 (La.1986).

In *U.S. v. Bagley*, 473 U.S. 667, 676, 105 S.CT. 3375, 3380 (1985), the Court held that under *Brady*, there was no distinction between exculpatory evidence and impeachment evidence. See, *State v. Ortiz, supra*. *Bagley* abandoned the second and third distinctions of *Agurs* and established that, regardless of whether a request is made, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.*, 473 U.S., 682.   A reasonable probability was defined as "a probability sufficient to undermine confidence in the

outcome." *United States v. Bagley*, 473 U.S. 667; 105 S.CT. 3375; 87 L.Ed.2d 481

(1985). See also *Knapper*, 579 So. 2d at 959; *Rosiere*, 488 So. 2d at 970-971.

The Supreme Court clarified: there are three components of a true *Brady*

violation: (1) The evidence at issue must be favorable to the accused; either

because it is exculpatory, or because it is impeaching; (2) that evidence must have

been suppressed by the State either willfully or inadvertently; and (3) prejudice

must have ensued.   *Strickler v. Greene*, 527 U.S. 263, 119 S.CT. 1936, 144

L.Ed.2d 286 (1999).

II.   *The Three Elements of Strickler in Establishing a Brady Violation*:

(A)   Beyond debate, the first such element of *Strickler v. Greene*, *supra*, in

establishing a Brady violation -- that the evidence be favorable to the accused as

exculpatory or impeaching – is evident in this case, i.e., the deal made with

Dorothy Jo Mallard & the deal made with Roderick Earl Johnson in exchange for

their  testimony.  The above evidence is *favorable, exculpatory*, and *impeaching*.

The defense requested this material in it's Motion for Discovery, only to be

mislead by the prosecution. Disclosure of the above evidence to competent counsel

would have resulted in a markedly weaker case for the prosecution and there is

more than a 'reasonable probability' that the outcome would have been different

had this evidence been presented and heard by the fact finding jurors.

(B)   Regarding the second *Strickler* component in establishing a *Brady* violation,

Shaw shows cause when his failure to develop facts in State-Court proceedings

was due to the State's suppression of the evidence. Nowhere in the record can it be

seen that the prosecution ever mentioned any   *DEALS*, and Defense Counsel's

actions and/or inactions exacerbated those of the prosecution. In any event,

prosecutors are responsible for "any favorable evidence known to the others acting

on the government's behalf in the case, including the police." When police or

20

prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight. *Kyles v. Whitley*, 514 U.S. 419, 115 S.CT. 1555, 131 L.Ed.2d 490 (1995). Nowhere in the record is there *anything* to support that the prosecution ever mentioned that the deal existed with Dorothy Jo Mallard or Roderick Earl Johnson. (See: Exhibit"C", a copy of Roderick Earl Johnson's Original taped statement that was withheld from the defense and Petitioner.)

(C) Coincident with the third Strickler component in establishing a *Brady* violation – that prejudice ensued – prejudice within the compass of the "*cause and prejudice*" requirement exists when suppressed evidence is "*material*" for Brady purposes. The materiality standard for *Brady* claims is met when "the favorable evidence could reasonably be taken to put the whole case in a different light as to undermine the confidence of the outcome." *Kyles*, at 435. To be sure, this evidence would have put the whole case in a different light. This evidence was *pertinent, advantageous*, and *exculpatory* to the defense. In verity, had the fact finding jurors been presented with evidence of extreme leniency, and the fact that all those charges were dropped and testimony known to be false were corrected, there is more than a reasonable probability that this would have altered the outcome of the proceedings.

Petitioner asserts the State knew of, but kept back, the deals made with Dorothy Jo Mallard & Roderick Earl Johnson. It was incumbent on the prosecution to disclose *Brady* material and McClendon cannot be faulted for relying on that. See *Strickler*, 527 U.S., at 283-284, 119 S.CT. 1936.

This Court must provide a cumulative evaluation of the suppressed evidence, keeping in mind that McClendon does not have to show that, with the addition of the suppressed evidence, his trial would have resulted in acquittal or

that there would be insufficient evidence to support a conviction. McClendon need only show that "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable." *Kyles*, 115 S.CT. at 1569.

In support, McClendon cites *State v. Bailey*, 367 So.2d 368 (La. 1979), wherein, the State failed to disclose impeachment evidence against the State's only witness concerning any deals he may have made with the State concerning his arrest on a other charges before trial. The State also failed to tell him that it had arranged for the release of the witness *without bail* pending the trial, and then did not seek to have the witness jailed until some days after trial when some other party complained to a magistrate. The defendant was convicted, and when he learned of these facts, he filed a motion for new trial contending that his *Brady* rights had been violated. The trial court denied the motion, and the defendant appealed. On appeal, the Court reversed the defendant's conviction and sentence, granting him a new trial.

Similarly here, the state's star witness and the only witness to put the gun in petitioner's hand, had her bond set at $50,000.00 and she had no constitutional right to even have a bond. The Court cited *Brady v. Maryland*, 373 U.S. 83, 83 S.CT. 1194, 10 L.Ed.2d 215 (1963) for the general rule that the State's failure to disclose material evidence which is favorable to the defense justifies the granting of a new trial. In addition, Roderick Earl Johnson was given a deal to change his original statement in order for the prosecution to obtain a conviction against Petitioner. The Court also cited *Giglio v. United States*, 405 U.S. 150, 92 S.CT. 763, 31 L.Ed.2d 104 (1972), which extended *Brady* to evidence that would damage the credibility of the State's witnesses. Quoting from *Giglio*, the Court noted:

> When the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure of evidence affecting credibility falls within this general rule. . . Moreover, whether the nondisclosure

22

discouraged.").

The existence of prejudice in this case is marked. It is untenable that one could conclude that Patrick McClendon received a *fair trial*, given the jury's ignorance of the fact that the State was in collusion with Dorothy Jo Mallard and Roderick Earl Johnson concerning the deals made with both of the state's witnesses, and withheld the same. It cannot be said with any noticeable amount of confidence that had the jury known these facts, the verdict would have been the same. Of course, we will never know because the State cheated. Without these facts, the truth will never be manifest.

## CONCLUSION

WHEREFORE, petitioner contends that he has shown that the prosecution has violated discovery and this violation if of constitutional dimensions. His Constitutional Right to Confrontation was denied by the trial Court denying his objections to the trial testimony of Dr. Casama. This testimony should be stricken as inadmissible. His right to a fair and partial trial has also been taken away by this misconduct by the district attorney's office, by discovery violations. The district attorney's office should have turned over all exculpatory material in petitioner's criminal trial, especially deals made with witnesses, the fact that the prosecution solicited false testimony from Dorothy Jo Mallard, and Roderick Earl Johnson in order to obtain a conviction they allowed the trial testimony to go uncorrected. Then Petitioner has shown that the 22nd Judicial District Court has refused to even allow the District Attorney's Office the opportunity to answer the allegations, thereby denying Petitioner his constitutional right to access to the Courts.

## PRAYER FOR RELIEF

Mr. Patrick McClendon prays that this Honorable Court grants his Application for Supervisory Writ of review, grants him a new trial, with proper

discovery and grants relief that he has available to him due to the errors presented
herein and any other such relief this Honorable Court deems appropriate.

Respectfully submitted this 21st day of September, 2010.

Patrick McClendon #106727
Camp "C" Bear-2
Louisiana State Penitentiary
Angola, LA 70712

## AFFIDAVIT / CERTIFICATE OF SERVICE

I, Patrick McClendon, hereby swear and aver that the foregoing is true and
correct to the best of my knowledge and belief. I, Patrick McClendon, hereby
further swear and aver that a copy of the foregoing has been served upon counsel
for the Respondent, Walter Reed, D.A., Parish of Washington, by placing a copy of
same in the U.S. Mail, properly addressed and postage pre-paid.

Done this 21st day of September, 2010.

*Patrick McClendon*

Patrick McClendon #106727

26

# The Supreme Court of the State of Louisiana

STATE EX REL. PATRICK MCCLENDON

NO.   2010-KH-2194

VS.

STATE OF LOUISIANA

- - - - - -

IN RE:  McClendon, Patrick; - Plaintiff; Applying For Supervisory
and/or Remedial Writs, Parish of Washington,  22nd Judicial District
Court Div. H, No. 93-CR1-54452; to the Court of Appeal, First
Circuit, No. 2010 KW 1042;

- - - - - -

**September 30, 2011**

Denied.

> JPV
>
> BJJ
>
> JTK
>
> JLW
>
> GGG
>
> MRC

Supreme Court of Louisiana
September 30, 2011

*Carmen B. Young*

**Deputy**   Clerk of Court
For the Court